# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RAYMOND EUGENE JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-016-CVE-FHM |
| | ) | |
| ANITA TRAMMELL, Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

---

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## PURSUANT TO 28 U.S.C. § 2254

---

**THOMAS D. HIRD**
**SARAH M. JERNIGAN**
**Assistant Federal Public Defenders**
**Western District of Oklahoma**
**215 Dean A. McGee, Suite 707**
**Oklahoma City, OK 73102**
**(405) 609-5975 / (405) 609-5976 - fax**
**Tom_Hird@fd.org**
**Sarah_Jernigan@fd.org**

**BEVERLY A. ATTEBERRY**
**P.O. Box 420**
**Tulsa, OK 74101-0420**
**(918) 605-1913**

**COUNSEL FOR PETITIONER,**
**RAYMOND EUGENE JOHNSON**

**December 13, 2013**

**TABLE OF CONTENTS**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

INTRODUCTION (and Conflict of Interest Claim). . . . . . . . . . . . . . . . . . . . . . . . 1

PRIOR PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      Conviction .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        B.      Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        C.      Application for Post-Conviction Relief . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF THE CASE .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

GROUND ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Appellate counsel was ineffective for failing to raise prosecutorial misconduct claims regarding misstating the law and misleading the jury in second stage proceedings.

        A.      Introduction .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        B.      Ineffective Assistance of Appellate Counsel Analysis . . . . . . . . . . . . . . . 22
        C.      Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        D.      Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

GROUND TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Mr. Johnson's rights to effective trial and appellate counsel were violated in regard to the outright exclusion, and reduction, of compelling mitigation evidence.

        A.      Introduction .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        B.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        C.      The Law on Curtailment of Mitigation Evidence .. . . . . . . . . . . . . . . . . 33
        D.      Ineffective Assistance of Trial and Appellate Counsel Analyses .. . . . . . . 35
        E.      Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

F.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
G.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**GROUND THREE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

The jury selection process employed by the trial court violated Mr. Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**GROUND FOUR** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Trial and "appellate" counsel failed to adequately investigate, develop, and present critical mitigating evidence.

A.    Introduction .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
B.    The Minimal Defense Effort .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
C.    Investigation and Mitigation Failure Addressed on
       Post-Conviction "Appeal" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
D.    Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
E.    The Unreasonable Ruling by the OCCA . . . . . . . . . . . . . . . . . . . . . 69
F.    Subsequent Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
G.    Additional Insights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
H.    Procedural Posture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
I.    "Appellate" Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
J.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

**GROUND FIVE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

The lack of adequate instructions to guide the Jury's sentencing decision violated Mr. Johnson's Sixth Amendment right to a fair trial, his Eighth Amendment right to a reliable capital sentencing, and his Fourteenth Amendment right to due process.

A.    A History of Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

**GROUND SIX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

The accumulation of errors violated Mr. Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

PRECAUTIONARY STATEMENT CONCERNING PROCEDURAL DEFAULT . . 114

REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

MOTION FOR EVIDENTIARY HEARING AND BRIEF IN SUPPORT . . . . . . . . . 122

      GROUND FOUR .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

      GROUND ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

      GROUND TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

MOTION FOR DISCOVERY AND BRIEF IN SUPPORT . . . . . . . . . . . . . . . . . . . . 126

      DEFINITIONS .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

      ARGUMENT AND AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

      SPECIFIC REQUESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

# TABLE OF AUTHORITIES

## <u>UNITED STATES SUPREME COURT CASES</u>

*Adams v. Texas,* 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Ake v. Oklahoma,* 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117, 118

*Banks v. Dretke,* 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Beck v. Alabama,* 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Berger v. U.S.,* 295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Boulden v. Holman,* 394 U.S. 478 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Boyde v. California,* 494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bracy v. Gramley,* 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*Brady v. Maryland,* 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . 128, 129

*Brecht v. Abrahamson,* 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Bruton v. United States,* 391 U.S. 123 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Caldwell v. Mississippi,* 472 U.S. 320 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Chambers v. Mississippi,* 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Coleman v. Thompson,* 501 U.S. 722 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Cuyler v. Sullivan,* 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Darden v. Wainwright,* 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Donnelly v. DeChristoforo,* 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Eddings v. Oklahoma,* 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 34

*Evitts v. Lucey,* 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 102

*Furman v. Georgia,* 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 108

*Gardner v. Florida,* 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Gray v. Mississippi,* 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Green v. Georgia,* 442 U.S. 95 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

*Harris v. Reed,* 489 U.S. 255 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Hitchcock v. Dugger,* 481 U.S. 393 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Imbler v. Pachtman,* 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Johnson v. Mississippi,* 486 U.S. 578 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 115

*Johnson v. Oklahoma,* ___ U.S. ___, 133 S.Ct. 191 . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Kelly v. South Carolina,* 534 U.S. 246 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*Kimmelman v. Morrison,* 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lockett v. Ohio,* 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . 2, 11, 27, 28, 31, 34,
                                                                      36, 42, 55, 70, 72, 99

*Maples v. Thomas,* ___ U.S. ___, 132 S.Ct. 912 (2012) . . . . . . . . . . . . . . . . . . . . . 121

*Martinez v. Ryan,* ___ U.S. ___, 132 S.Ct. 1309 (2012) . . . . . . . . . . . . 56, 119, 120, 121

*McKoy v. North Carolina,* 494 U.S. 433 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Miller-El v. Cockrell,* 537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Morgan v. Illinois,* 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50, 54

*Napue v. Illinois,* 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*O'Neal v. McAninch,* 513 U.S. 432 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Payne v. Tennessee,* 501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51 (1937) . . . . . . . . . . . . . . . . . . . . 26

*Penry v. Lynaugh,* 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rhines v. Weber,* 544 U.S. 269 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101

*Rompilla v. Beard,* 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . 23, 69, 102, 103

*Simmons v. South Carolina,* 512 U.S. 154 (1994) . . . . . . . . . . . . . 105, 106, 107, 108, 109

*Skipper v. South Carolina,* 476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 34

*Smith v. Robbins,* 528 U.S. 259 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Strickland v. Washington,* 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . 4, 5, 22, 23, 69, 71,
102,115, 120, 121

*Tennard v. Dretke,* 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 42

*Townsend v. Sain,* 372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123, 130

*Trevino v. Thaler,* ___ U.S. ___, 133 S.Ct. 1911 (2013) . . . . . . . . . . . . . . . . . . . . . . 119

*Trop v. Dulles,* 356 U.S. 86 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Cronic,* 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Vasquez v. Hillery,* 474 U.S. 254 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Wainwright v. Witt,* 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 50

*Wiggins v. Smith,* 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 43, 68, 69, 102

*Williams v. New York,* 337 U.S. 241 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36, 55

*Williams v. Taylor,* 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 34, 68, 69, 102

*Witherspoon v. Illinois,* 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 49

*Wood v. Georgia,* 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Woodson v. North Carolina,* 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . 10, 26, 88, 127

## FEDERAL CASES

*Anderson v. Sirmons,* 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . 69, 73, 116

*Andrews v. Deland,* 943 F.2d 1162 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Banks v. Reynolds,* 54 F.3d 1508 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Banks v. Workman,* 692 F.3d 1133 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 116, 117

*Barkell v. Crouse,* 468 F.3d 684 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Battenfield v. Gibson,* 236 F.3d 1215 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 75

*Brecheen v. Reynolds,* 41 F.3d 1343 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 115

*Cannon v. Mullin,* 383 F.3d 1152 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Cargle v. Mullin,* 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . 12, 69, 111, 112, 114

*Coleman v. Zant,* 708 F.2d 541 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Darks v. Mullin,* 327 F.3d 1001 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Douglas v. Workman,* 560 F.3d 1156 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 26, 128

*Dutton v. Brown,* 812 F.2d 593 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*English v. Cody,* 146 F.3d 1257 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 115

*Evans v. Secretary, Department of Corrections*, 703 F.3d 116 (11th Cir. 2013) . . . . . . . 72

*Ferrell v. Hall,* 640 F.3d 1199 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Fisher v. Gibson,* 282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Freeman v. Lane,* 962 F.2d 1252 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Hatch v. Oklahoma,* 58 F.3d 1447 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Hill v. Lockhart,* 28 F.3d 832 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 87

*Hooks v. Ward,* 184 F.3d 1206 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Knapp v. Henderson,* 166 F.3d 347 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Lingar v. Bowersox,* 176 F.3d 453 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Martinez v. Sullivan,* 881 F.2d 921 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Mayes v. Gibson,* 210 F.3d 1284 (10th Cir. 2000) . . . . . . . . . 34, 36, 56, 75, 107, 108, 109

*Miller v. Champion,* 161 F.3d 1249 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 122

*Mitchell v. Gibson,* 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Morris v. Dretke,* 413 F.3d 484 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Neill v. Gibson,* 278 F.3d 1044 (10th Cir. 2001) . . . . . . . . . . . . . 15, 22, 24, 102, 118, 121

*Newsted v. Gibson,* 158 F.3d 1085 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Paxton v. Ward,* 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Smith v. Mullin,* 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Stouffer v. Reynolds,* 168 F.3d 1155 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Thomas v. Goldsmith,* 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Rivera,* 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 111

*United States v. Toles,* 297 F.3d 959 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Williamson v. Ward,* 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Willingham v. Mullin,* 296 F.3d 917 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 111

**STATE CASES**

*Bland v. State,* 991 P.2d 1039 (Okla. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 129

*Coddington v. State,* 142 P.3d 437 (Okla. Crim. App. 2006) . . . . . . . . . . . . . . . . . 41, 73

*Good v. State,* 723 S.W.2d 734 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Harris v. State,* 164 P.3d 1103 (Okla. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Johnson v. State,* 272 P.3d 720 (Okla. Crim. App. 2012) . . . . . . . . . . . . . 7, **9**, 53, **108**, 113

*Littlejohn v. State,* 85 P.3d 287 (Okla. Crim. App. 2004) . . . . . . . . . . . . . . 103**,** 104**,** 105

*Malicoat v. State,* 992 P.2d 383 (Okla. Crim. App. 2000) . . . . . . . . . . . . . . 105, 116, 118

*Miller v. State,* \_\_\_ P.3d \_\_\_, 2013 WL 4805683 (Okla. Crim. App. 2013) . . . . . 2, 50, 51

*Mitchell v. State,* 136 P.3d 671 (Okla. Crim. App. 2006) . . . . . . . . . . . . . . . . . . . . . 32, 41

*People v. Garcia,* 17 Cal.App.4th 1169 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*People v. Gonzalez,* 51 Cal.3d 1179 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Simpson v. State,* 230 P.3d 888 (Okla. Crim. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . 76

*Slaughter v. State,* 108 P.3d 1052 (Okla. Crim. App. 2005) . . . . . . . . . . . . . . . . . 101, 116

*Solomon v. State,* 49 S.A.3d 356 (Tex. Crim. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . 41

*State v. Smith,* 381 S.E.2d 724 (S.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Valdez v. State,* 46 P.3d 703 (Okla. Crim. App. 2002) . . . . . . . . . . . . . 101, 116, 117, 118

*Warner v. State,* 29 P.3d 569 (Okla. Crim. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 73

## FEDERAL STATUTES

ABA Guidelines ............................................................. 54, 102

28 U.S.C. §2254(d)(1) and (2) ...................................... 70, 120

## STATE STATUTES

Okla. Stat. tit. 21 ...................................... 9, 106, 116

## DOCKETED CASES

*Johnson v. State,* Case No. PCD-2009-1025 (Okla. Crim. App. 2012) ............... 8

*Matthews v. State,* Case No. PCD-2010-1193 (Okla. Crim. App. Jan. 7, 2011) . ..... 117

*Smith v. Sirmons,* Case No. 05-6206 (10th Cir. Dec. 5, 2005) .................... 100

*Wood v. State*, Case No. PCD-2011-590 (Okla. Crim. App. Sept. 30, 2011) . ........ 117

*Woodruff v. Ward*, Case No. CIV-96-1076 (W.D. Okla. July 22, 1999) . ........... 128

## OTHER AUTHORITIES

Bill Braun, *Prosecutor is Named Special Judge*, Tulsa World,
November 18, 2009. ..................................................... 12

Bill Braun, *Old and New Tulsa County Judges Get New Assignments*,
Tulsa World, November 12, 2010 .. ....................................... 12

Crocker, *Childhood Abuse and Adult Murder: Implications for the Death Penalty*, 77
N.C.L. Rev. 1143, 1143-1148, 1154-1155 (1999) ......................... 87, 99

William Geimer, *Law and Reality in the Capital Penalty Trial*, 18 N.Y.U.
Rev.L. & Soc. Change 273, 286 ...................................... 42, 86, 99

Grey, *Neuroscience, PTSD, and Sentencing Mitigation*, Cardozo 34 Law Rev. 53, 82-83
(2012) ................................................................ 90

Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation,* 35 Santa Clara L. Rev. 547, 560-61, 603-04 (1995) . . . . . . . . . . . . . 55, 86, 97

Lindsey, Edward, Letter to the Editor, *Judging Issues*, Tulsa World, November 6, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Litton, *The "Abuse Excuse" in Capital Sentencing Trials: Is it Relevant to Responsibility, Punishment, or Neither?*, 42 Am. Crim. L. Rev. 1027, 1033 (2005) . . . . . . . . . . . . . . . 90

Lowenthal, *Mandatory Sentencing Laws: Undermining the Effectiveness of Determinate Sentencing Reform*, 81 Calif. L. Rev. 61 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 105

Okla. Historical Soc'y, Tulsa Race Riot, Encyclopedia of Okla. History & Culture, http://digital.library.okstate.edu/encyclopedia/entries/T/TU013.html . . . . . . . . . . . . . . . 1

Steiker, Carol S. and Jordan M. Steiker, *Report to the ALI Concerning Capital Punishment*, (2008) online at http://www.ali.org/doc/Capital%?20Punishment_web.pdf . . . . . . . . . . . . . . . . . . . . . . . 1

## EXHIBITS

1   *Johnson v. State*, Case No. PCD-2009-1025, slip op. (Okla. Crim App. 2012)
2   Affidavit of Curtis Allen
3   Memo Gregg Graves 6-29-2009
4   CD Lexington Praise Team
5   Trial Exhibit Video - Client Sermon
6   Affidavit of Jeremy Maxwell
7   Oklahoman Newspaper Articles re Lloyd James Bell
8   Affidavit of Laura Hendrix
9   Affidavit of Cory Gibson
10   CV of Victoria Reynolds, Ph.D.
11   Psychological Report of Victoria Reynolds, Ph.D.
12   Affidavit of April Viney
13   Affidavit of Kevin Newton
14   Affidavit of Kevin Moss
15   Affidavit of Latoya Adamson
16   Affidavit of Sidricke Lewis
17   Affidavit of Sylvia Goodlow
18   Affidavit of Terrance Cook
19   Affidavit of Tanishe McCarroll
20   Affidavit of Arthur Johnson
21   Affidavit of Felicia Crosby
22   Affidavit of Mary Miller
23   Affidavit of Micah Maxwell
24   Affidavit of Reverend James Reed
25   Bankruptcy Docket Sheets
26   Photos of Artura Hamilton & Raymond Johnson
27   Harold Jones Interview
28   Declaration of Dr. Betty Evans
29   Affidavit of Anna Wright re Interview with Denise Jones
30   Affidavit of Linda Johnson
31   Affidavit of Wayna Tyner
32   *Wood v. State*
33   *Matthews v. State*
34   Affidavit of Anna Wright re Taquisha Rose
35   Affidavit of Anna Wright re Jeanette Maxwell
36   Affidavit of Michael Johns
37   Affidavit of Rodney Floyd
38   Tulsa Day Center Records

## INTRODUCTION
### (and Conflict of Interest Claim)

Raymond Johnson is a black man who was tried for murdering a white woman and the baby he once thought was his in Tulsa, Oklahoma, a city that has never fully recovered after a black man was accused of assaulting a white woman some ninety-two years ago.[1]  He was sentenced to death and his death sentence was affirmed in proceedings that were unfair and unconstitutional in several different ways.

His trial judge was inexperienced, having never presided over a death penalty case. Her last job was as an assistant district attorney at the Tulsa County District Attorney's Office.  The attorneys prosecuting Raymond Johnson's case were senior attorneys at the same office who previously had supervisory roles over her (one more so than the other) when she worked as an assistant district attorney.

The campaign that propelled her into a judgeship is notable as well.  She was touted as a law-and-order candidate with a prosecutorial bent, while her opponent, a sitting judge, was labeled soft on crime.  It led some to believe she would "rubber stamp" her "former colleagues."  Edward Lindsey, Letter to the Editor, *Judging Issues,* Tulsa

---

[1] The Tulsa Race Riot of 1921 was less of a riot and more of an organized and efficient expulsion of a group of people, akin to a pogrom or massacre. *See* Okla. Historical Soc'y, Tulsa Race Riot, Encyclopedia of Okla. History & Culture, http://digital.library.okstate.edu/encyclopedia/entries/T/TU013.html.  As argued in Mr. Johnson's direct appeal, "To deny that race is a factor in the imposition of the death penalty ignores United States history."  DA at 34, *citing* Carol S. Steiker and Jordan M. Steiker, *Report to the ALI Concerning Capital Punishment* (2008).

1

World, November 6, 2006.

Whether conscious or unconscious, it appears the judge never lost her prosecutorial mind-set.  This can be seen in several of the grounds raised herein, and, for example, from her handling of the Victor Miller case (discussed in Ground Three).  As Judge Clancy Smith of the OCCA noted, Judge Kuehn was "particularly unfair" in allowing *prosecutorial* questioning of venire-persons, but not *defense* questioning.  *Miller v. State,* ___ P.3d ___, 2013 WL 4805683, *19 (Okla. Crim. App. 2013).

The judge did not give the sentencing proceeding, in particular, the type of consideration it was due under the law.  Indeed, because of errors by the trial judge, prosecutors, and defense counsel, Raymond Johnson did not receive anything close to the type of sentencing proceeding he was entitled to under the United States Constitution.  When a person's very life hangs in the balance, the Supreme Court has repeatedly insisted upon *higher* standards of reliability and fairness. *See Beck v. Alabama*, 447 U.S. 625, 637 (1980) (demanding need for heightened reliability); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (noting the penalty of death is qualitatively different from any other sentence and requires a heightened degree of reliability).  In no way were the standards for reliability and fairness higher at Mr. Johnson's sentencing proceeding.

On appeal, the conspicuous violation of Raymond Johnson's constitutional rights continued.  Part of this was due to the assignment of an attorney to write his appeal brief who had no co-counsel or any death-penalty experience.  More importantly, the set-up at

the Tulsa County Public Defender's Office asked this inexperienced attorney not just to evaluate the competence of his older and more experienced colleagues, but his older and more experienced *supervisors*. The result does not come close to withstanding constitutional scrutiny. Counsel never should have been put in that position.

Nothing much apparently changed at the Tulsa County Public Defender's Office in the aftermath of *Cannon v. Mullin,* 383 F.3d 1152 (10th Cir. 2004). In *Cannon,* the Tenth Circuit noted:

> Mr. Cannon was represented at trial by two attorneys from the Tulsa Public Defender's office. He was represented on direct appeal by another attorney from the same office. Mr. Cannon argues that two attorneys who work in the same Public Defender's office cannot be considered "separate" counsel within the meaning of *English* [*v. Cody,* 146 F.3d 1257, 1259 (10th Cir. 1998)]. He further alleges that his appellate counsel had a policy of not arguing ineffective assistance of trial counsel in cases tried by the Public Defender's office.

> Mr. Cannon's allegations raise serious concerns under *English.* The requirement that trial and appellate counsel differ derives from two considerations. First, a defendant, on his own as a layman, will "ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance." *Kimmelman*, 477 U.S. at 378, 106 S.Ct. 2574. Second, a lawyer who renders ineffective assistance at trial will likely be hesitant to raise his own trial inadequacies on appeal, or even inform the client of any inadequacies.

> That second consideration may still have force when distinct lawyers handle the trial and appeal but the two are professionally aligned. If a criminal defendant is represented by trial and appellate counsel from the same office, appellate counsel's assessment of trial counsel's performance ***may be less than completely objective***. An understandable, although inappropriate, ***regard for collegiality*** may restrain appellate counsel from identifying and arguing trial-attorney error. We note that two lawyers from the same private law firm are often treated as one for conflict-of-interest purposes. See

Restatement (Third) of the Law Governing Lawyers § 123 & cmt. d(iv) (2000) ("Restatement") (discussing imputation of conflicts among affiliated lawyers and noting that the "rules on imputed conflicts and screening ... apply to a public-defender organization as they do to a law firm in private practice in a similar situation"); *Martinez v. Sullivan*, 881 F.2d 921, 930 (10th Cir.1989) (assuming that two law partners should be considered as one attorney for conflict-of-interest purposes). When an appellate attorney argues ineffective assistance of trial counsel, he is arguing that the trial attorney—who may have an office down the hall—"was not a reasonably competent attorney," *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052 (internal quotation marks omitted), and that trial counsel's representation was so bad that it was not within "the range of competence demanded of attorneys in criminal cases." *Id.* (internal quotation marks omitted). Arguing ineffective assistance with respect to a colleague's performance is saying that the performance was not only inferior, but unreasonable. These are indeed ***bold statements to make about a co-worker***. Presenting an ineffective-assistance-of-counsel claim may well damage the reputation of the trial attorney and the office for which both trial and appellate counsel work.

In our view, whether trial and appellate attorneys from the same "office" should be deemed "separate" counsel will turn on the specific circumstances.

*Id.* at 1173 (emphasis added).

The "specific circumstances" here cry out for relief. *Id.* All the concerns about objectivity and collegiality and boldness apply with special force to a ***subordinate asked to criticize his bosses.*** The psychological, subconscious effect is inherently damaging. Appellate lawyer Curtis Allen speaks strongly to this in his affidavit, attached as Exhibit 2. The proof is also in the pudding, as the failures in the direct appeal brief are self-evident - the brief itself is plainly deficient.

It should be noted that the test for ineffective assistance is relaxed in cases of

conflict of interest.  *Strickland v. Washington*, 466 U.S. 668, 692 (1984).  As the Court

observed in *Strickland*:

> In *Cuyler v. Sullivan*, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest.  In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties.  Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.

*Id.*  (internal citation omitted).  The Supreme Court has also observed courts cannot

expect a lawyer to concede his own conflict.  *Wood v. Georgia*, 450 U.S. 261, 265 n.5

(1981) ("It is unlikely that [the lawyer] would concede that he had continued improperly

to act as counsel.").

The OCCA was faced with this drastic conflict-of-interest issue when it was raised

in Mr. Johnson's application for post-conviction relief.  The OCCA ordered a response,

which it does not ordinarily do.  The OCCA could not have been happy with what

happened with Raymond Johnson's appeal.  Yet, the OCCA specifically chose not to

address "the issue of whether appellate counsel failed to raise the issues of ineffective

assistance of trial counsel because of a conflict of interest."  Exhibit 1 at 3 n.2.  As such,

Petitioner's conflict-of-interest claim must be considered fully exhausted.

As noted on post-conviction, appellate counsel completely abrogated his

responsibility to investigate or otherwise act outside the record.  *See* PC Att. 4.  Appellate

counsel abandoned that critical component of the representation and left Mr. Johnson

with a purely record-based appeal.  *See U.S. v. Cronic*, 466 U.S. 648, 659 n.25 (1984)

(noting the Court has found constitutional error without any showing of prejudice when counsel was either totally absent or prevented from assisting the accused during a critical stage of the proceeding).  The conflict-of-interest issue greatly impacts the ineffective assistance of counsel claims presented in this petition, as well as standing on its own as a ground for relief.

Raymond Johnson was clearly denied effective assistance of appellate counsel, in several different ways, and the conflict of interest that existed at the Tulsa Public Defender's Office was a clear part of the ineffectiveness.  For whatever reason, the recognized conflict-of-interest problem at the Tulsa County Public Defender's Office was allowed to continue against clients' best interests and against the Constitution.

The crime at issue here was bad, but there is no crime so bad that a juror might not be persuaded to grant the defendant life.  Nor is there a crime so bad that the defendant forfeits his right to a fair trial and effective assistance of counsel, both trial *and appellate*. Raymond Johnson's life was on the line at his trial.  Instead of higher standards of reliability and fairness, lower standards ensued, much to Mr. Johnson's prejudice.  The Constitution cannot allow his sentence to stand.

## PRIOR PROCEEDINGS

### A.    Conviction:

Court:       District Court of Tulsa County, State of Oklahoma

Case No.:    CF-2007-3514

Charge:         Murder in the First Degree, Count I
                Murder in the First Degree, Count II
                Arson in the First Degree, Count III

Plea:           Not guilty.

Trial:          By jury.

Verdict:        Guilty on all counts.

Sentence:       Death on Counts I, II; Life on Count III.

Date:           Jury trial conducted June 15-26, 2009.

Counsel
appointed:      Mr. Pete Silva
                Chief Public Defender
                Tulsa County Public Defender's Office
                423 South Boulder, Suite 300
                Tulsa, OK 74103

                Mr. Gregg Graves
                Assistant Public Defender
                Tulsa County Public Defender's Office
                423 South Boulder, Suite 300
                Tulsa, OK 74103

#### B.   **Direct Appeal:**

Court:          Oklahoma Court of Criminal Appeals

Case No.:       D-2009-702

Opinions:       *Johnson v. State*, 272 P.3d 720 (Okla. Crim. App. 2012).

Result:         Convictions and sentences affirmed.

Certiorari:     *Johnson v. Oklahoma*, __ U.S. __, 133 S.Ct. 191 (Oct. 1, 2012).

Counsel:        Mr. Curtis Allen

Assistant Public Defender
Tulsa County Public Defender's Office
423 South Boulder, Suite 300
Tulsa, OK 74103

**C.**    **Application for Post-Conviction Relief:**

Court:          Oklahoma Court of Criminal Appeals

Case No.:       PCD-2009-1025

Opinion:        Denied, *Johnson v. State*, Case No. PCD-2009-1025, slip op. (Okla. Crim
                App. 2012).  Attached as Exhibit 1.

Counsel:        Wayna Tyner
                Oklahoma Indigent Defense System
                P.O. Box 926
                Norman, OK 73070

Mr. Johnson has no other petition, application, motion, or appeal pending currently in any other court.  The trial transcript referenced as "Tr.," then by volume and page.  The motion hearing transcripts shall be referenced as "month/day/year Tr.," followed by page. The original record shall be referred to by volume as "O.R.," followed by page number. The direct appeal brief shall be referenced as DA, and post-conviction application as PC.

### STATEMENT OF THE CASE
**Procedural History**

Raymond Johnson was tried by a jury on June 15-26, 2009, in Tulsa County District Court, Case No. CF-2007-3514, before District Judge Dana Kuehn for two counts of Murder in the First Degree and one count of Arson in the First Degree.  Tr. I 13.  The jury found Mr. Johnson guilty on all counts.  Tr. IX 1871-1872.

8

In the penalty phase, the jury found the existence of aggravating circumstances on the counts of First Degree Murder. Tr. X 2111-12; Okla. Stat. tit. 21, §701.12(1) & (2) (1991).  The jury sentenced Mr. Johnson to death on both counts one and two. 7/28/2009 Tr. 5-6.  Mr. Johnson was formally sentenced on July 28, 2009. 7/28/09 Tr. 7-8.

Mr. Johnson commenced a direct appeal, which was denied by the Oklahoma Court of Criminal Appeals.  *Johnson v. State*, 272 P.3d 720 (Okla. Crim. App. 2012), *cert. denied Johnson v. Oklahoma*, __ U.S. __, 133 S.Ct. 191 (Oct. 1, 2012).  Mr. Johnson also pursued a state post-conviction action during the direct appeal under Case No. PCD-2009-1025.  The post-conviction application was denied by order entered December 14, 2012.  Exhibit 1.

Mr. Johnson initiated this action with a request for counsel.  Doc. 1.  This petition is timely submitted pursuant to the Court's scheduling order as amended.  Doc. 18.

### STATEMENT OF THE FACTS

Brooke Whitaker worked as a nude dancer at Escapades, located at 11th Street and Sheridan Road in Tulsa, Oklahoma.  On her way home from work on June 23, 2007, at approximately 3:30 a.m., she stopped to picked up one of her children, seven-month-old Kya Whittaker,[2] who was staying at Ms. Whitaker's mother's house.  Raymond Johnson,

---

[2] A review of the trial transcript reveals the State knew at the time of trial that Raymond Johnson was not Kya Whitaker's father.  Yet the State argued he was on appeal, and the OCCA incorrectly believed the same, stating he was in its opinion affirming Johnson's conviction and death sentence. *Johnson v. State,* 272 P.3d 720, 724 (Okla. Crim. App. 2012).  When this error was pointed out on post-conviction, neither the State nor the

Ms. Whitaker's off-and-on boyfriend, was waiting at Brooke's house when she got home. She let him in, and they talked, took care of Kya, and had sex. Later, he and Brooke got into an argument. Brooke grabbed a knife from the kitchen. They argued some more and Raymond grabbed a hammer from the kitchen and hit Brooke in the head with the hammer. He hit her several more times and eventually retrieved a gas can from a shed in the back yard, doused Brooke and the house with gasoline, threw a lit towel on Brooke and left through the back door. Brooke Whitaker died from blunt trauma to the head and smoke inhalation. Kya Whitaker died from thermal injury. Mr. Johnson never denied committing the crime, but from the beginning stated the circumstances of Kya's death did not take place the way the State believed, and that he did not intend to kill her.

## GROUND ONE

**Appellate counsel was ineffective for failing to raise prosecutorial misconduct claims regarding misstating the law and misleading the jury in second stage proceedings.**

### A. Introduction.

For decades, the Supreme Court of the United States has recognized that a capital defendant is entitled to an "individualized" sentencing determination. *See, e.g., Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (holding that mandatory death sentence for first-degree murder without consideration of the character and record of the individual offender and the circumstances of the particular offense was inconsistent with the

---

OCCA disputed an error was made.

fundamental respect for humanity which underlies the Eighth Amendment).  To that end, the Supreme Court has held "that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original).  *See also Eddings v. Oklahoma*, 455 U.S. 104 (1982);  *Skipper v. South Carolina*, 476 U.S. 1 (1986).

It is not enough simply to allow the defendant to present mitigating evidence to the jury. The jury must also be able to consider and *give effect to* that evidence in imposing the sentence.  *See, e.g., Hitchcock v. Dugger*, 481 U.S. 393, 398–99 (1987).  Because of prosecutorial misconduct in this case, the jury in Raymond Johnson's case was unable to give effect to the second-stage mitigation evidence presented.

The jurors' introduction to the concept of mitigating circumstances started out on the wrong foot.  The trial judge told them on their first day of voir dire that "[m]itigating circumstances are those which in fairness, sympathy and mercy may extenuate or reduce the degree of moral culpability or blame of the defendant," with the judge also noting that such circumstances may be found "from any evidence that has been presented."  Tr. I at 8.

Sometimes the judge broke down her definition of mitigating circumstances into two sentences, putting the "fairness, sympathy and mercy" part into a second sentence,

but it is very clear that at other times she did not, creating a lasting impression from early on that the inquiry was always at its core an inquiry of moral culpability. For example, from the third day of voir dire, the trial judge defined mitigating circumstances as:

> circumstances that may extenuate or reduce the degree of moral culpability or blame, circumstances which in fairness, sympathy, or mercy may lead you as jurors, individually or collectively, to decide against imposing the death penalty.

Tr. III at 352-53.

Seasoned assistant district attorney William Musseman hammered this limiting impression home, planting a limiting definition of mitigation in the minds of the jury from the very beginning. Indeed, Musseman managed to poison the jurors' conception of mitigating circumstances throughout the trial, from voir dire to the end of the sentencing stage.

It is well known jurors tend to follow the lead of, and the directions of, the state's prosecutor, due to his "special aura of legitimacy" and "imprimatur of the Government." *Cargle v. Mullin*, 317 F.3d 1196, 1218 (10th Cir. 2003). While this effect applies to any prosecutor, Musseman especially stands out in this regard. A "veteran" prosecutor and son of a judge, he was named a special judge less than five months after Johnson's trial, and soon thereafter elevated to district judge. *See, e.g.,* Bill Braun, *Prosecutor is Named Special Judge*, Tulsa World, November 18, 2009; Bill Braun, *Old and New Tulsa County Judges Get New Assignments*, Tulsa World, November 12, 2010. As such, his judicial presence and gravitas gave his words even greater influence.

12

As he also did later in second-stage proceedings, in voir dire soon-to-be-judge Musseman purported to "read" to the jury the law, i.e., what the written instructions from the judge would be:

> MR. MUSSEMAN: Now, mitigating circumstances -- I always butcher it, so just let me kind of *read* what I think *you'll be told by the Judge*. Mitigating circumstances are those which in fairness, sympathy and mercy may *extenuate or reduce the degree of moral culpability or blame.* The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case. *In other words*, if you reach the point where you found the defendant guilty beyond a reasonable doubt and you have found the existence of at least one aggravating circumstance beyond a reasonable doubt, you are then to consider any mitigating circumstances that might be present in the case. Those are those circumstances *I read to you* that in fairness, sympathy or mercy *may reduce the degree of moral culpability or blame*.  You can consider any that you find in a case.

Tr. III at 386-87 (emphasis added).  As can be seen, the definition read by Musseman informed the jury that mitigating circumstances only pertained to moral culpability.

The next day, Musseman apparently spoke as if he was reading the law to the jury again, as his words (and misinformation) were almost exactly the same:

> Mitigating circumstances are those which in fairness, sympathy, and mercy may extenuate or *reduce the degree of moral culpability or blame*. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case. *In other words*, if you find yourself in a position where you have determined the State has proved the existence of at least [one] aggravating circumstance beyond a reasonable doubt, you are then to look for and consider any mitigating circumstances. And those are those things like I said: That in fairness, sympathy, or mercy may *reduce the degree of moral culpability* on the part of the defendant.

Tr. IV at 698 (emphasis added).

13

The jurors were not lawyers or legal experts and had never been involved in a capital trial before. They heard a lot of confusing jargon in voir dire. To be sure, they heard much misinformation from the prosecution and judge, more than enough to be confused, and to think mitigation evidence had one purpose – to reduce moral culpability.

The jurors finished voir dire with a confused (at the very least) understanding of mitigation. This remained true all the way through first stage proceedings, and through the presentation of the evidence in the second stage proceeding. Then it got even worse.

The prosecution, aided by rulings of the trial judge, sealed the deal on a misinformed understanding of mitigation at the end of the trial in second-stage closing arguments. Soon-to-be-judge Musseman again spoke with authority and again spoke of the actual instructions of the presiding judge, i.e., "the judge will tell you," "the question, as the judge tells you," "but the judge tells you," "the [judge's] instruction says this:." Tr. X at 2092-94. Over and over again, the theme was that there was **one inquiry** for the jury, and that inquiry was an assessment of *moral culpability*.

The worst of the egregious mischaracterizations was an exchange where the prosecutor specifically told the jury that the jury instructions from the judge required the jury to **limit** its consideration only to the issue of moral culpability. Musseman purported to **read** to the jury the judge's instruction in making his point:

> ADA Musseman:    ... **The instruction says this**:
> *Your consideration must be <u>limited</u> to a moral inquiry as to culpability of the defendant.*
> That's what the law says.

> Mr. Graves: Again, Your Honor, I am going to object. That is not an accurate statement of what the law says, to consider more than aggravators. For the sentence, they consider mitigation.
>
> The Court:    Note your exception. ***Overruled.***

Tr. X at 2094-95 (emphasis added).  As will be discussed in more detail later, this exchange, in itself, was an unforgivable violation of Raymond Johnson's constitutional rights.

A valid question is what was Musseman reading from so authoritatively (yet so improperly).  At that point, the official second-stage judicial instructions had been revealed to the jury, and it appeared he was reading from those instructions, as he specifically said "the instruction says. "  Tr. X at 2094.  The jury must have believed that he was, as "the average jury...has confidence...[in] the prosecuting attorney." *Berger v. U.S.*, 295 U.S. 78, 88 (1935).

Then, his statement received the official stamp of approval from the trial judge when she overruled defense counsel's objection.  *See, e.g., Neill v. Gibson,* 278 F.3d 1044, 1073 (10th Cir. 2001)  ("The trial court's overruling of defense counsel's objection effectively stamped an imprimatur of approval on the prosecution's comments").  As such, when a trial judge overrules an objection to an improper argument, the ruling *magnifies* the harm. *Good v. State*, 723 S.W.2d 734, 738 (Tex. Crim. App. 1986).

The jurors thus had every reason to take the esteemed prosecutor and esteemed judge's word for it that the law under the instructions limited his or her consideration to a

moral inquiry as to culpability of the defendant.  If any juror did not, upon review of the jury instructions he or she would have indeed found that language.  A searching juror would have found it in the *victim-impact* instruction.  O.R. VI at 1080.  As such, not only did the statement have a magnified "special aura" of authority, it had a ring of familiarity, as the trial judge had used that language.

The esteemed prosecutor quoted part of a sentence from the victim-impact instruction, and applied it as a **limitation** on Raymond Johnson's mitigation evidence, and the trial judge endorsed this with her stamp of approval.  A layperson juror would not know it was completely taken out of context, nor would a layperson juror know it was an *astounding legal error.*[3]  That the jurors would not know better is especially true considering the statement was endorsed by the prosecutor and judge.  Moreover, the first and last instruction to the jurors made a point of emphasizing that they must consider all the instructions "together" and "as a whole."  O.R. VI at 1083.

Musseman repeatedly told the jury that mitigating evidence was limited and must be filtered through the lens of moral culpability.  Then the trial court magnified this egregious error through its stamp-of-approval rulings.

As contrast, consider an isolated (rather than pervasive) misstatement of the law by Musseman.  One time only, he argued to the jury that if the aggravating circumstances

---

[3] Indeed, the OCCA has called it "an *egregious* misstatement of the law."  *Harris v. State*, 164 P.3d 1103, 1114 (Okla. Crim. App. 2007).

16

outweighed any mitigation circumstances, then it was mandatory that the jury impose the death penalty:

> If the aggravating circumstances outweigh those mitigating circumstances, you *are* to impose the sentence of death.

Tr. X at 2084-85 (emphasis added).

This was, in itself, an egregious, harmful, misstatement of the law. As noted elsewhere, the defense not once tried to show that the mitigating circumstances outweighed the aggravating circumstances in Mr. Johnson's case. The defense only posited that Johnson's life would have value if he was allowed to live. As such, the misstatement cut to the heart of the second stage defense.

However, Musseman only said it once, it was not given the stamp of approval from the trial judge, and a jury instruction clearly stated that "[e]ven if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole." O.R. VI 1078.

The opposite is true of Musseman's improper statements regarding mitigation. He relentlessly repeated his improper theory, the judge stamped it with her imprimatur of approval, and the jury instructions do not *clearly* say anything about kinds of mitigating evidence that are not tied to moral culpability.

On this point, the State has argued that the portion of the jury instruction vaguely mentioning mitigating "circumstances which in fairness, sympathy or mercy may lead you

17

as jurors individually or collectively to decide against imposing the death penalty," and the occasional, inconsistent references made to that amorphous sentence, somehow serve to make the blatant prosecutorial misrepresentations alright. To the contrary, they in no way cure the constitutional violation, for a number of reasons.

One problem is the wording of the instruction in itself. It states:

Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

O.R. VI at 1076.

As can be seen, there are two descriptions of mitigating circumstances, presented as an "or" choice for the jurors, with the jurors specifically given full power to choose for themselves what is mitigating. Moreover, the mushy second choice borders on unintelligibility. A juror could easily think the disjunctive descriptions encompass the same ground or were two ways of saying the same thing, especially with the prosecutor repeatedly saying things like, "In other words ...[mitigating circumstances] reduce the degree of moral culpability or blame." *E.g.*, Tr. III at 386-87, Tr. IV at 698. Even without such misstatements of the law in this case, a lay person on the jury could easily think that the overriding inquiry stayed *squarely* on moral culpability.[4]

---

[4] Such concerns were raised by the trial defense in pleadings (e.g., Defendant's Objection to Standard Jury Instructions Re: Evaluation of Mitigating Evidence, filed

Compounding the problem here was a prosecutor intentionally pounding away at that improper concept, repeating again and again that ***the inquiry*** was moral culpability. Indeed, looking at the broader context of ADA Musseman's entire comments throughout trial, it almost appears he 1) had a completely errant understanding of mitigation evidence, 2) he fervently believed in his errant understanding, and 3) he was determined to indoctrinate the jury with this errant understanding.[5]

And indoctrinate he did, especially in second-stage closing argument. Over and over again he pounded the idea into the jury's head that the inquiry was one of moral culpability:

> ADA Musseman: You now consider the mitigating factors that you may or may not find exist and you weigh them against the aggravating circumstances. ...**The inquiry** that you are to make as jurors, **the Judge will tell you in the instructions**, is **one of moral culpability**. You are to assess the level of moral culpability that falls upon the shoulders of Raymond

---

September 3, 2008), and a proposed jury instruction. O.R. II 257-59; O.R. VI 961-62.

[5] Consider, for example, this argument to the judge from Musseman while in the process of seeking to exclude proper mitigation evidence:

> I don't believe photographs of a person in life as an adult or life as a child goes to *either of those elements* [listed in the mitigating circumstances instruction]. *It doesn't tend to give them any evidence which would suggest a reason that his moral culpability was lessened.*

Tr. X at 1953 (emphasis added). In sum, either the prosecutor himself was incapable of understanding the law and believed the inquiry was limited to moral culpability, or he intentionally misled the jury. Either way his position was magnified by a seal of approval from the trial court's rulings. Giving the prosecutor the benefit of the doubt and accepting hypothesis number one as true, i.e., that this veteran prosecutor himself did not understand that mitigation was not limited to moral culpability, then how in the world were the jurors, unlearned in the law, supposed to overcome the stacked deck against them and come to a better understanding than the veteran prosecutor?

19

Johnson.

. . . .

What does that say about his **moral culpability? Because that's <u>the</u> inquiry.**

...

What does that have to say about **moral culpability?** I don't deny for one minute **there are people that love him and there are good people who will suffer if you sentence him to die. <u>But</u> I submit to you that <u>the question</u>, as the Judge tells you, is an inquiry into moral culpability.** You **can** consider what those people say and do, **<u>but</u> the Judge tells you <u>the</u> inquiry is about moral culpability:** Have the facts of this case--

Mr. Graves: Your Honor, I'm going to object to the repeated statement that the inquiry is limited to moral culpability.

The Court: Overruled. Note your exception.
Again, ladies and gentlemen, closing argument is for persuasion purposes only. You may continue.

ADA Musseman: Thank you.  **The instruction says this**:
       **Your consideration must be <u>limited</u> to a moral inquiry as to culpability of the defendant. That's what the law says**.

Mr. Graves: Again, Your Honor, I am going to object. That is not an accurate statement of what the law says, to consider more than aggravators. For the sentence, they consider mitigation.

The Court: Note your exception. Overruled.

...

... the Judge tells you you are to consider the aggravating circumstances that the State, I submit, has proven. **You are to consider whatever mitigating circumstances you think there are. You are to weigh them** and render the verdict and the decision on punishment that you think is appropriate. ***But while doing so***, **the Judge tells you that moral culpability is <u>the</u> inquiry.**

...

I know that there are people that care for him.  Is anything you have heard from them a circumstance that extenuates or reduces his degree of moral culpability or blame in these killings? ...
circumstances, which in fairness, sympathy, or mercy maybe you, as jurors,

individually or collectively, can decide against imposing the death penalty. That's for you to decide.  **But** when you're considering what those people told you ... think about this: He had a good childhood. ... he knows right from wrong. ... What I am asking you to do is consider the evidence ... and **assess his degree of moral culpability or blame.** The evidence has shown that **his degree of moral culpability is great and the appropriate punishment is death.**

Tr. X at 2091-2097 (emphasis added).

The overall effect is unmistakable.  Musseman plainly made his case that the inquiry was <u>limited</u> to the issue of moral culpability, and the evidence presented by the defense was not relevant because it did not reduce Mr. Johnson's moral culpability or blame.  Any reference to the second definition of mitigating evidence was negated by Musseman's limiting arguments and the trial judge's stamp of approval on those arguments (as well as the vagueness of the definition itself).  It was less than helpful for the prosecutor to reference the second definition, all the while negating it with his words. Musseman made it very clear that he thought it was fine for the jurors to *consider* Johnson's other evidence, as long as they remembered that their consideration was limited to the inquiry of moral culpability.  But what good does it do to consider evidence when the evidence has no application to the inquiry at hand?  The answer is it does no good at all.  Thanks to prosecutorial misconduct, the jury was unable to *give effect* to the second-stage defense in this case.

Musseman told the jury over and over again that the law limits what evidence is mitigating, and that the defense's evidence must be filtered through the lens of moral

culpability.   The trial court endorsed this view through its rulings.   The effect was an egregious constitutional violation that obliterated Mr. Johnson's entire second-stage defense.

> **B.      Ineffective Assistance of Appellate Counsel Analysis**.

*Neill v. Gibson,* 278 F.3d 1044 (10th Cir. 2001) provides a template for analysis of this ineffective assistance of appellate counsel claim and references Supreme Court law governing that analysis.   In *Neill,* the Tenth Circuit held as follows:

> *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs this ineffective-appellate-assistance inquiry. *See Smith* [*v. Robbins*], 528 U.S. at 285 ...    Neill, therefore, must establish both that counsel's performance was deficient and that his defense was thereby prejudiced. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Here, the relevant questions are whether appellate counsel was "objectively unreasonable" in failing to raise these prosecutorial-misconduct claims on direct appeal and, if so, whether there is a "reasonable probability that, but for his counsel's unreasonable failure" to raise these claims, Neill "would have prevailed on his appeal." *Smith*, 528 U.S. at 285-86, 120 S.Ct. 746 (applying *Strickland*, 466 U.S. at 687-91, 694, 104 S.Ct. 2052). "When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue."

*Id.* at 1057.

On post-conviction, the OCCA described the instant claim in three words ("misstated the law"), discussed only one of the prongs (the prejudice prong), and took only one sentence to do it ("Johnson has not shown a reasonable probability that but for appellate counsel's deficient performance in failing to raise these issues on direct appeal the result of the trial and sentencing proceedings would have been different").   Exhibit 1

at 11-12. The OCCA decision was contrary to law and unreasonable.

### C.   Deficient Performance.

The OCCA did not address the merits of the deficient-performance component of Johnson's ineffective assistance of appellate counsel claim. When a state court adjudicates one aspect necessary to resolve a constitutional claim, but fails to adjudicate another, the federal court's review of the unadjudicated aspect of the claim is de novo. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). *See Ferrell v. Hall*, 640 F.3d 1199, 1226 (11th Cir. 2011) (evaluating prejudice element of *Strickland* claim de novo where state court discussed reasonableness of counsel's performance but never addressed prejudice).

Not that it matters in this case. Whether the Court reviews the claim de novo or in the deferential light of AEDPA, the result is the same. Deficient performance is plain from the face of the direct appeal record. The issue was well preserved, and prominent in the record, with trial counsel Graves repeatedly objecting to the misconduct. The effect of the misconduct of limiting mitigating evidence to evidence reducing moral culpability was also especially conspicuous, as the *entire second-stage defense presentation was irrelevant to moral culpability*. In sum, the prosecutor's continuously-argued theory negating the entire second stage defense was both significant and obvious. Furthermore, a review of the direct appeal opening brief reveals the propositions raised in the direct appeal would not and could not overshadow or cause an effective counsel to omit this

serious and substantial claim.[6]   Appellate counsel's performance was objectively unreasonable.

**D.     Prejudice**.

The law no longer requires that the omitted appellate claim be a "dead-bang winner."  A mere reasonable probability of success now suffices.  *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).  The instant claim prevails under either standard.

The instant claim also prevails under either prosecutorial-misconduct standard of review, as the misconduct separately violated both the Eighth and Fourteenth Amendments.  Prosecutorial misconduct may offend the Constitution in two different ways, one more reprehensible on its face in violating a specific constitutional right, but the other insidious to a fair trial by rendering it fundamentally unfair.  Misconduct that invades a specific constitutional right is given heightened scrutiny. *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  The more general scrutiny looks to whether the prosecutor's comments so infected the proceeding with unfairness as to make the sentencing determination a denial of due process.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

In *Paxton v. Ward,* 199 F.3d 1197 (10th Cir. 1999), the Tenth Circuit was faced

---

[6] Moreover, direct appeal counsel's affidavit *strongly* supports a finding of deficient performance. Exhibit 2.  Although requested on post-conviction, no evidentiary hearing was granted by the OCCA regarding this issue.  See Exhibit 1 at 13.

with prosecutorial misconduct that offended Paxton's constitutional right "to present mitigating evidence." *Id.* at 1218.  The Court held this was a specific constitutional right, allowing Paxton to "establish his entitlement to habeas relief without showing that the comments rendered his sentencing fundamentally unfair." *Id.*  As such, the complained-of errors fall within the specific-constitutional-right standard, which is easily met here.

But Mr. Johnson's claim is so strong it prevails under the harder fundamental fairness standard as well.  The prosecutor's misconduct truly rendered the entire sentencing proceeding unfair.  By telling the jury that its consideration must be limited to moral culpability, the prosecutor obliterated the sentencing-stage defense, as <u>none</u> of the defense evidence presented pertained to moral culpability or blame.  Zero.  Mr. Johnson submits a proceeding where one side's evidence is negated represents the epitome of fundamental unfairness.  A careful review of the sentencing stage proceedings as a whole leads to no other conclusion but that the misconduct here infected the proceeding with unreliability and unfairness.

Prosecutors must be especially careful about fairness, and especially careful about their constraints and responsibilities on those grave occasions when the State seeks to put a man to death:

> [p]rosecutors are subject to constraints and responsibilities that don't apply to other lawyers. While lawyers representing private parties may-indeed, must-do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, *staying well within the rules*. As Justice Douglas once warned, "[t]he function of

25

the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall."

...

[W]e apply a *heightened concern for fairness* in this case, where the state is prepared to take a man's life.

*Douglas v. Workman,* 560 F.3d 1156, 1194 (10th Cir. 2009) (internal citations omitted)

(emphasis added).

The Supreme Court has been clear about the importance of this issue:

A process that accords no significance to relevant facets of the character and record of the individual offender ... excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings ...

This Court has previously recognized that "(f)or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman v. Georgia*, 408 U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C.J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, *see Trop v. Dulles*, 356 U.S., at 100, 78 S.Ct., at 597 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Woodson v. North Carolina,* 428 U.S. 280, 304 (1976).    The ability to make an

26

individualized case, showing the "uniqueness of the individual," is not just important in capital cases, it is "essential." *Lockett v. Ohio,* 438 U.S. 586, 605 (1978).

There is more than a reasonable probability that Mr. Johnson would have prevailed on this issue on appeal. The mitigation case presented by the defense was aimed at getting one juror to decide life without parole might be an appropriate sentence for Raymond Johnson. The sole theme presented was that his "life, based upon his conduct when he was previously in prison, is capable of redemption and a life of value." Tr. X at 1976. No argument or evidence was presented to reduce his degree of moral culpability or blame. The prosecutor, aided by the judge's rulings, effectively swayed jurors to believe the inquiry was "limited," and the defense theme should be given no effect.

Petitioner respectfully submits that any time an error has the power to wipe out a party's entire trial presentation, raising that error on appeal has a reasonable probability of success. The Writ should issue accordingly.

## GROUND TWO

**Mr. Johnson's rights to effective trial and appellate counsel were violated in regard to the outright exclusion, and reduction, of compelling mitigation evidence.**

### A.    Introduction.

In Ground One, Mr. Johnson showed that the prosecutor (with the help of errant rulings by the trial judge) improperly influenced jurors into believing the prosecutor's unconstitutional theory that the jurors' inquiry into mitigation was limited to the issue of moral culpability. In this ground, Mr. Johnson will show how errant legal theories and

ineffective trial and appellate representation resulted in a proceeding marred by the unconstitutional exclusion and reduction of valuable mitigating evidence. As a result, those jurors not led astray by the prosecutor's relentless barrage of misleading statements on the law of mitigation, and still able to *give effect* to non-culpability based mitigation (if indeed there were any such jurors), were deprived of the "fullest information possible concerning the defendant's life and characteristics," all to Mr. Johnson's great detriment. *Lockett v. Ohio*, 438 U.S. 586, 603 (1978).

## B.   Background.

Some backdrop is helpful in understanding the context of these errors. From the earliest stages the trial court was focused on a two-week time period for trying Mr. Johnson's capital case. *See, e.g.,* 10/22/2007 Tr. at 8; 02/25/2009 Tr. at 13. The trial indeed lasted two weeks (starting Monday June 15, 2009, and ending Friday June 26, 2009), but did not last longer only because the trial court did things like rushing through voir dire, *see* Ground Four, *infra*, and particularly, toward the end of the trial, excluding second-stage defense evidence and pressuring and rushing the second-stage defense.[7]

---

[7] *See* memorandum of Gregg Graves, Exhibit 3 at ¶4; Affidavit of Michael Johns, Exhibit 36 at ¶¶6-8. A review of the trial transcripts also confirms, for example, the contention that only on the last day of trial when the defense was putting on mitigation evidence did the trial court rush the lunch hour, squeezing everything into one final day. *See* Tr. X at 2075, compared with, e.g., Tr. III at 452, Tr. IV at 742, Tr. V at 1031, Tr. VII at 1436, Tr. VIII at 1642-43. Every lunch break appears to have been *over* one hour except for the last day of trial when the defense was arguing for Mr. Johnson's very life yet being rushed through its mitigation case. Then it was 30 minutes. Tr. X at 2075. For more examples of the trial court's rushed mind-set toward the end of trial, see also Tr. VIII at

On Tuesday of the second week of trial, with the two-week window rapidly closing, the prosecution filed a document entitled Objection to Witnesses/Evidence for Second Stage. O.R. V 883-84. On Thursday the trial court addressed the objections during a hearing conducted outside the presence of the jury. Tr. IX 1885-95.

According to its written objection, the State objected to Mr. Johnson's "first nine of 10 witnesses" on his witness list as being cumulative and objected to most of "witnesses 11 through 21" as being cumulative. O.R. V 883-84; Tr. IX 1885-89. Under increasing pressure, Mr. Johnson's trial counsel limited the testimony of the mitigation witnesses called to testify. In addition to the nine witnesses that did testify, the defense had subpoenaed an additional eleven witnesses who were not called to testify. Those witnesses were Linda Johnson, Mr. Johnson's mother; Reverend Harold White; Donna K. Thompson; Chaplain Duane G. Baker; Bishop Arthur D. Johnson, Sr., Mr. Johnson's step-father; Terrance L. Cook; Helen Pipkin; Laura Hendrix; Jim Rabon, Director of DOC Sentencing Administration; Joy A. Jones; and Jennifer L. Walton. O.R. III 445, 448; 453-55, 461, 564; O.R. V 826, 836, 873-76; O.R. VI 991-92.

Defense counsel advised they had (substantially) shortened their witness list and had provided that list to the State the day before. Tr. IX 1885-86. Even with all that cutting, Assistant District Attorney Musseman would not relent and argued Mr. Johnson's witnesses

_____

1766; Tr. IX at 1946.

fall into, I believe, two categories.   They're either inmates with the defendant who participated or know about his prison ministries.   And then there is [sic] reverends or chaplains that participated or helped him set up the prison ministries, and they all testify the same, or at least we are put on notice of the same summary.

Tr. IX at 1888.   Defense counsel immediately refuted Musseman's argument:

MR. GRAVES: Actually, Your Honor, I would disagree with that. There have been transcripts of recorded statements provided by almost every one of these witnesses that describe their unique relationship with the defendant, their unique activities with which they engage the defendant or have observed the defendant do.
The chaplains were chaplains at different times and, in fact, at different 1ocations. The inmates from Lexington; one is from a different location.
The prison ministers each engage in a separate prison ministry in which the defendant was involved.   And because of the uniqueness of each one of these, we believe that certainly in a death penalty case that it is appropriate to bring these individuals.
We do intend to streamline it as much as possible and avoid any cumulative effect.

Tr. IX at 1888-89.   In response the trial court stated it was going to overrule the objection, "but take it under advisement," inviting the prosecutor to "still [] raise a cumulative objection and we can do an offer of proof before witnesses are called." Tr. IX at 1889. Later, the trial court plainly informed defense counsel that it did not matter if a witness testified regarding Raymond's ministry and good works at a different correctional facility, if the witness had the same opinion as a previous witness, "I am going to start sustaining cumulative objections. ... structure your case appropriately."  Tr. X at 2033.

Next, at the hearing the court took up the issue of the audio CD of Mr. Johnson singing in a prison band.  In Mr. Johnson's List of Witnesses and Exhibits filed April 13,

2009, he listed an entire CD of inspirational praise songs that prison inmates, led by Raymond Johnson, had the wherewithal to create *while in prison* at Lexington Assessment & Reception Center. O.R. at 397, Tr. X Ex. 4, Exhibit 4 CD Lexington Praise Team. Under pressure from the prosecution and court, defense counsel limited his request to playing *one song* (out of *eleven tracks*)*,* and then, under further pressure, *just 30 seconds* from one song. Tr. IX at 1889-90; Tr. X at 1964-67. *Now Behold the Lamb*, featuring Raymond Johnson singing lead and harmony vocals, went from a five minute song to a 30-second snippet. It was sponsored by witness Artina Johnson, and rather than being given the "fullest information possible," (*Lockett*, 438 U.S. at 603), the jury barely began to get a feel for the song before it was cut off. Tr. X at 1967, 1995-96. Four-and-a-half minutes were saved (not counting the time arguing over it), at the cost of Mr. Johnson's constitutional rights.

What one individual juror may respond to varies from person to person, but probably the most crucial loss of evidence, and the most egregious and harmful of all the trial court's mitigation-curtailing actions, was in regard to the videotape of a church service Raymond Johnson led (including the preaching of the sermon), while incarcerated at Lexington Assessment & Reception Center. The trajectory regarding the sermon exhibit was similar to the trajectory regarding the music CD exhibit, going from the one-hour church service Mr. Johnson conducted, then to defense counsel pleading to the judge for "at least" a five minute clip (Tr. IX 1891), and then some cutting down further still to

31

a two minute clip.  Tr. IX at 1891; Tr. X at 1959-60, 1964.[8]  Even with the hugely

truncated two-minute version, defense counsel rightly called it "***very persuasive*** evidence

... giv[ing] an ***example and a demonstration*** to the jury of his abilities as a minister." Tr.

X at 2044 (emphasis added).

Unfortunately, and quite unconstitutionally, the jury was deprived of seeing even a

small sliver of this incredible piece of mitigating evidence.  In excluding this valuable and

persuasive piece of evidence, the trial court flatly stated "I am going to deny your request

to admit that exhibit. ...  How effective a minister he is, I don't think goes towards

mitigation." Tr. X at 2044.[9]  The trial court's statement was patently wrong, and the

---

[8] The defense made the following offer of proof as to Defendant's Exhibit 5:

Mr. Graves:[I]t is approximately a two- or three-minute clip of Mr. Johnson preaching. It was filmed sometime in approximately 1997, I believe. That Mr. Marty Williams was present when it was filmed; he actually participated in the service. It's about an hour-long service. We have reduced that down to a two-minute clip. Mr. Williams was prepared and capable of sponsoring that. It is simply a small vignette, I guess, to show Mr. Johnson's unique skills as a minister and to provide documentary evidence to establish the mitigators relating to Mr. Johnson's ministry.

Tr. X at 2079.

[9] The trial judge "also" noted she had hearsay concerns depending upon how the video exhibit was sponsored.  Tr. X at 2044-45.  This alternative, contingent concern was not the basis of the court's ruling, was unfounded, and would have been unreasonable in any event under clearly established law even if it was the basis of the court's ruling. *See, e.g., Green v. Georgia,* 442 U.S. 95, 97 (1979) (per curiam) (holding hearsay rule may not be applied mechanistically); *Chambers v. Mississippi,* 410 U.S. 284, 302 (1973) (same); *See also Mitchell v. State,* 136 P.3d 671, 697 (Okla. Crim. App. 2006) ("The constitutional mandate to allow a capital defendant broad scope in the presentation of mitigating character evidence is well established, as is the error in mechanistically applying the [hearsay] rules of evidence

exclusion of the video a terrible mistake.

Not as damaging (but emblematic of their misguided mitigation mind-set) is the fact the prosecution and trial court could not even allow five family photographs to come into evidence in mitigation. A familiar routine was followed as the evidence was reduced in stages, with the original number of photographs reduced down to five, then reduced again after the prosecution persisted that they were *all* irrelevant and all should be barred. Tr. IX 1893. ADA Musseman once again showed his unconstitutional understanding of mitigation in having this to say about the five family photographs:

> I don't believe photographs of a person in life as an adult or life as a child goes to either of those elements [listed in the mitigating circumstances instruction].[10] It doesn't tend to give them any evidence which would suggest a reason that his moral culpability was lessened.

Tr. X 1953.[11] The trial court allowed two of the five photographs to be introduced into evidence, over the State's objections. Tr. X at 1958.

**C.    The law on curtailment of mitigation evidence**.

The Supreme Court has stated many times, in no uncertain terms, that evidence such as in question here must be given to the jury and given full effect:

When we addressed directly the relevance standard applicable to mitigating

---

to defeat this right.").

[10] "1) Circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty." O.R. VI at 1076.

[11] For more on the utter impropriety of Musseman's position, see Ground One.

> evidence in capital cases in *McKoy v. North Carolina*, 494 U.S. 433, 440-441, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), we spoke in the ***most expansive terms***.
>
> > ...
>
> Once this ***low threshold*** for relevance is met, the "Eighth Amendment requires that the jury be able to ***consider and give effect to***" a capital defendant's mitigating evidence. *Boyde v. California*, 494 U.S. 370, 377-378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (citing *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Penry I*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)); see also *Payne v. Tennessee*, 501 U.S. 808, 822, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ("We have held that a State ***cannot preclude*** the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death.... *[V]irtually no limits are placed* on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances" (quoting *Eddings, supra*, at 114, 102 S.Ct. 869)).

*Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (emphasis added).  *See also Skipper v.*

*South Carolina*, 476 U.S. 1 (1986); *Green v. Georgia,* 442 U.S. 95 (1979).

The Tenth Circuit has chimed in many times as well.  For example:

> [W]e are also conscious of the ***overwhelming importance*** of the role mitigation evidence plays in the just imposition of the death penalty. The presentation of mitigation evidence affords an opportunity to humanize and explain–to individualize a defendant ***outside the constraints of the normal rules of evidence***. ... [T]he right to present mitigating evidence to the jury is constitutionally protected. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1512-13, 146 L.Ed.2d 389 (2000) *See also Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ... We are therefore compelled to insure the sentencing jury makes an individualized decision while equipped with the "***fullest information possible*** concerning the defendant's life and characteristics," and must ***scrutinize carefully <u>any</u>*** decision by counsel which deprives a capital defendant of ***<u>all</u>*** mitigation evidence. *Lockett*, 438 U.S. at 603, 98 S.Ct. 2954. ...

*Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (emphasis added).  *See also*

*Dutton v. Brown,* 812 F.2d 593, 599-601 (10th Cir. 1987).

      **D.**      **Ineffective assistance of trial and appellate counsel analyses.**

Post-conviction counsel clearly raised the claims referenced herein under the rubric of ineffective assistance of trial counsel and ineffective assistance of appellate counsel (*see, e.g.,* "The following sub-propositions are all examples of ineffective assistance of counsel, either by trial counsel, appellate counsel, or both, " PC at 3; "Mr. Johnson requests this Court find trial counsel and appellate counsel were not "separate;" and therefore, not apply a procedural bar to the review of his claims of ineffective assistance of trial counsel." PC at 4).  For standards regarding ineffective assistance of trial counsel, see Ground Four at 68-69.  For standards regarding ineffective assistance of appellate counsel, see Ground One at 22-27.  Looming over this ground too is the conflict of interest issue raised at post-conviction and the Introduction of this petition.

The OCCA addressed the claims on the merits and denied relief.  Regarding the trial court and prosecutor's bullying on mitigation, and the trial counsel allowing herself to be "bullied" into limiting the mitigation case, the OCCA conclusorily found that Mr. Johnson had not shown deficient performance or a reasonable probability that but for the alleged failings of trial and appellate counsel he would not have received the death penalty. Exhibit 1 at 7-8. Regarding the *exclusion* of the mitigation evidence, addressed in the very next paragraph of the OCCA opinion, the OCCA noticeably skipped the deficient performance prong, and conclusorily found Johnson had not *proved* prejudice.

Exhibit 1 at 8.  The OCCA's wispy conclusions were unreasonable and contrary to law.

### E.    Deficient performance.

Trial counsel certainly should have acquiesced less, and fought more, against the substantial diminution and denigration of his mitigation presentation.  After all, justice requires that a capital sentencing jury make an individualized decision while equipped with the "fullest information possible concerning the defendant's life and characteristics," and as such counsel must be scrutinized carefully any time he or she deprives a capital defendant of mitigation evidence.  *Mayes v. Gibson,* 210 F.3d 1284, 1288 (quoting *Lockett*, 438 U.S. at 603 and *Williams v. New York*, 337 U.S. 241, 247 (1949)).  As such, trial counsel's performance was clearly deficient.

What stands out as even more egregious, however, is appellate counsel's failure to raise the actions of the 1) prosecutor, 2) trial court, and 3) trial counsel regarding these matters.  This is especially true considering the nature of the case as a whole.

As post-conviction counsel noted, the evidence of guilt was strong enough in Mr. Johnson's case to be fairly called "a second stage case."  PC at 21.  These serious second-stage issues were not hard to find, especially for an attorney foregoing all extra-record investigation and "focus[ing] on only record issues."  PC Att. 4 at ¶2.  They were obvious from a reading of the most important record, i.e., the trial transcript.  And, defense trial counsel even sent a memo to appellate counsel pointing out the judge's hurry-up pressure regarding mitigation evidence and the record he made sure to make on the exclusion of

36

the compelling video of Mr. Johnson preaching in prison.  See Exhibit 3 at ¶4.  The memo

even invites appellate counsel to confer with trial counsel "any time to discuss this case

further."  *Id.*

Unfortunately, that did not happen.  Exhibit 2 at ¶6.  As discussed elsewhere, it is

also notable that appellate counsel was an inexperienced lawyer writing his first capital

appeal brief with no co-counsel to help him.  Moreover, he did not even have his brief

proofread, used less than half of his allotted page limit, and filed no reply brief.  *See*

Exhibit 2.  The deficient performance prong is easily met.

**F.      Prejudice**.

Mr. Johnson's witness and exhibit list originally listed 23 witnesses.   The

following is a partial description of subpoenaed witnesses who did not testify after

increasing pressure from the trial court and prosecutor:

> 1. Linda Bell Johnson ... the Defendant's mother. It is expected that she will
> testify as to matters including but not limited to her personal relationship
> with the Defendant; the circumstances of Defendant's childhood; his
> relationship with his family; that Defendant never knew his biological
> father; the criminal history of the Defendant's family members, including
> his father, maternal grandfather and maternal uncles; the Defendant's
> criminal history as known to her; the Defendant's involvement in church as
> a child, the Defendant's involvement in church while in the custody of the
> Department of Corrections; the Defendant's talent as a singer and the
> Defendant's calling as a minister.
> 2. Bishop A.D. Johnson, Sr. ... the Defendant's stepfather will testify as to
> matters including but not limited to his relationship with the Defendant; the
> circumstances of Defendant's childhood; the Defendant's relationship with
> his family; that Defendant never knew his biological father; the criminal
> history of the Defendant's step-family members; the Defendant's criminal
> history as known to the witness; the Defendant's involvement in church as a

child, the Defendant's involvement in church while in the custody of the Department of Corrections; the Defendant's talent as a singer and the Defendant's calling as a minister.

5. Jennifer Walton ... the Defendant's ex-girlfriend and the mother of the Defendant's child.  It is anticipated that Ms. Walton will testify as to her relationship with the Defendant and to the birth of his child after his incarceration in the present matter. ....

10. Joy Howard ... long time friend of the Defendant. It is anticipated that Ms. Howard will testify as to her relationship with the Defendant; the Defendant's childhood; the Defendant's involvement in church as a child; and the Defendant's talent as a singer. It is further anticipated that Ms. Howard will testify that she, the Defendant, and others recorded an album while in high school as a part of their church's youth choir.

12. Chaplain Duane Baker ... Chaplain for Davis Correctional Center in Holdenville, OK. Chaplain Baker was previously the Chaplain at Lexington Correctional Center. Chaplain Baker knew the Defendant while the Defendant was in the custody of the Oklahoma Department of Corrections. It is anticipated that Chaplain Baker will testify that while the Defendant was incarcerated he worked with the Chaplain to organize and set up church services for other inmates. Chaplain Baker is expected to testify regarding the Defendant's ministry while incarcerated in the Lexington Detention Center and the Davis Correctional Center.

13. Terrance Cook ... knew the Defendant as a youth and while the Defendant was incarcerated in the Davis Correctional Facility. It is anticipated that Mr. Cook will testify to matters including but not limited to his relationship with the Defendant; the Defendant's teenage years, the Defendant's criminal history as known by this witness; the Defendant's talent as a singer; the Defendant's ministry while incarcerated; the Defendant's time at Davis Correctional Center; the Defendant's role in prison as a peace maker; and the importance of the Defendant's role in the prison society.

16. Helen Pipkin ... served as a prison minister during the Defendant's previous incarceration.  It is anticipated that the witness will testify as to her relationship with the Defendant and his participation in prison ministries.

O.R. III at 390-401.

A review of this list reveals some crucial witnesses that could have made a real

difference.[12]   The exclusion of most of the song and two of the family photographs was harmful as well.   The preaching video was a goldmine of "positive prisoner" mitigation evidence.   There was and is evidence both inside and outside the record to show more than sufficient prejudice under the law.   *See, e.g.,* footnote 7, *supra*; Ex. 36 at ¶¶ 6-8.

As alluded to previously, the real centerpiece on the prejudice front may have been the exclusion of the preaching video.   The full, approximately 55-minute video was a beautiful multi-dimensional showcase of Raymond Johnson's abilities for helping and ministering to other inmates in a prison setting.   He led singing, led prayers, read scripture, preached, exhorted, sang beautiful excerpts from *Amazing Grace* and *Just As I Am*, and used his engaging personality and physicality in making religious points.   The video is appended hereto as Exhibit 5.

The twice-shortened, two-minute clip just showing part of the sermon was amazing and persuasive in itself:

> The Bible tells us, man, and I've learned, more and more, to be careful what you speak because you can speak it into existence.   Satan was defeated over 2,000 years ago, why do we give him power?   See, the power Satan has is the power you give him in your life, huh?   Do I have some believing Christians here tonight [clapping].   The only power that Satan has is what you give him.
> Put him under your feet, huh.   Put him under ...
> If we sitting up in our cell and we eating some food, we watching TV, we see those little critters, we see those roaches come out, and I know can't nobody stand no roaches.   We'll get out of the top bunk of the bed, get our

---

[12] *See*, for example, Ground Four at 73 n.27 regarding the crucial importance of having Mr. Johnson's mother Linda Johnson testify.

house shoe, and we'll track 'em down and kill them.  Am I right about that?
But as soon as Satan step in ....
[Mr. Johnson moves about the prison congregation, fellowshipping with individual inmates, saying "Brother, pray for me brother, brother pray for me I'm going through something, brother pray for me I'm going through something, then you come in the churchhouse, brothers y'all need to pray for me, I'm going through something"]
Now, just like I got up out the top bunk, got my house shoe, then I stepped on that roach, huh? .. [shouts from congregation] ...
Now when that **problem** comes, I'm gonna get down off my bed, and I'm going to step on this, then I'm going to **roll down to my knees** [kneels].
Same power that you can kill that roach is the same power you can kill that devil with [clapping].
So **prayer** is what we build our relationship with God.

Def. Ex. 5 (not admitted).

A cold written transcript does not give this excerpt from the church service justice,

but even a transcript would have been better than nothing at all.  A transcript would have

shown Mr. Johnson's talent for oratory, for example, and his knowledge of the power of

parable, especially a parable relatable to the orator's audience.

If only the highly-inconsistent OCCA would have treated Mr. Johnson's claims the

way it treated the claims of James Coddington:[13]

At a minimum, Coddington submits the redacted videotape should have been admitted and played for the jury. ... We agree.
...
... Having reviewed both the videotaped examination and the written examination, we note a compelling difference between seeing the witness testify to this valuable mitigation evidence and hearing someone read her

---

[13] Of note, Coddington killed 73-year-old Al Hale by hitting him repeatedly in the head with a hammer in order to steal money from him.  Still conscious, Hale was left to die a lingering, slow death.  142 P.3d at 442-43.

testimony. ...[14]

...

The ***best evidence***, in this case, was Hood's videotaped examination ... Videotaped confessions ... are regularly admitted to show the jury the demeanor of a person and the circumstances under which confessions are made.[15] ..."[I]n keeping with the policy of the courts to avail themselves of each and every aid of science for the purpose of ascertaining the truth ...

...

... *See e.g. Solomon v. State*, 49 S.W.3d 356, 366 (Tex.Crim.App.2001)(recognizing humanizing effect of live testimony); *People v. Enis*, 194 Ill.2d 361, 414, 743 N.E.2d 1, 30, 252 Ill.Dec. 427, 456 (Ill.2000)(noting live testimony of the affiants would have had more complete portrayal of the defendant). ...

... The fact finder "at trial often will gain ***greater insight*** from ... audio-visual devices. ...

...

... We cannot determine how the jury would have viewed Hood's testimony if it had actually seen her videotaped examination. However, the potential error would be of constitutional magnitude. The only proper remedy is to remand for a new sentencing hearing with an instruction that the new jury specifically be allowed to see Hood's videotaped examination.

*Coddington v. State*, 142 P.3d 437, 457-460 (Okla. Crim. App. 2006) (emphasis added).

*See also, e.g.*, *Mitchell v. State,* 136 P.3d 671, 697 (Okla. Crim. App. 2006) (noting evidence suggested a "devout side to [Mitchell's] personality in a way that none of the other evidence presented at his capital resentencing could or did, especially because they present the defendant in his own voice. The potential for such evidence to 'humanize' a defendant-particularly a defendant who has committed crimes as horrifying as

---

[14] In contrast, there is no mention of the OCCA reviewing Mr. Johnson's videotape and no comparison of it to the evidence that was admitted in Raymond Johnson's case.

[15] Indeed, Raymond Johnson's videotaped confession was presented by the State in this case.

Mitchell's-is far from insignificant.").

The video at issue here was compelling and powerful, and excluding it was contrary to clearly established Supreme Court law.  As previously mentioned, when the context is mitigation evidence proffered in the aim of sparing a capital defendant's life, juries must be given the "fullest information possible." *Lockett*, 438 U.S. at 603. "[V]irtually no limits are placed ...." *Tennard*, 542 U.S. at 285.

When trial counsel was given the videotape of Raymond Johnson's prison church service, he was given a veritable ***mother lode*** of "positive prisoner" mitigation evidence.[16]  Only one juror was needed to watch that video and say, "Hey, this guy can really preach!  Hey, this guy can really sing!  Hey, this guy can minister in a unique and valuable way to the other inmates in prison.  This guy can really make a difference, and should be placed in a general population prison setting for the rest of his life (rather than isolated 24 hours a day in an internationally condemned underground bunker until he is killed by state officials)."

As capital respondents often do, Respondent here is likely to fall back on arguments about the aggravating circumstances and how bad the crime was.  Those type of arguments tend to miss the point with errors like these.  Non-culpability-related

---

[16] *See, e.g.*, William Geimer, *Law and Reality in the Capital Penalty Trial,* 18 N.Y.U. Rev. L. & Soc. Change 273, 286 (1991) (noting scholar's identification of four general categories of mitigation evidence: empathy evidence, "good guy" evidence, "positive prisoner" evidence, and crime-related evidence).

mitigating evidence of the type here is aimed not only at persuading a juror the mitigating circumstances outweigh the aggravating circumstances, but also at persuading *just one juror* she or he should vote for Life Without Parole *even if* she finds the aggravating circumstances outweigh the mitigating circumstances.[17] *See, e.g., Wiggins v. Smith,* 539 U.S. 510, 513 (2003).

Evidence such as at issue here *transcends* the weighing of aggravators against mitigators, as it gives reason to spare a defendant's life despite the heavy aggravating circumstances.  The videotape evidence is the centerpiece of this ground for relief and would have been the compelling centerpiece of a mitigation presentation that had one theme: Raymond Johnson's "life, based upon his conduct when he was previously in prison, is capable of redemption and a life of value." Tr. X at 1976.  These errors are too great to ignore, as there is absolutely a reasonable probability that at least one juror—and it would only take one—could be sufficiently moved by the omitted evidence to choose to spare Mr. Johnson's life from execution.

**G.    Conclusion.**

The trial court committed reversible error in Mr. Johnson's capital sentencing

---

[17] This is something the prosecution-oriented tend to forget, indeed, prosecutor Musseman evidently did forget in this trial:

> If the aggravating circumstances outweigh those mitigating circumstances, you **are** to impose the sentence of death.

Tr. X at 2084-85 (emphasis added).  *See* Ground One at 17.

proceeding by excluding and curtailing relevant mitigating evidence in violation of his Eighth and Fourteenth Amendment rights. As a result, this Court should either grant the Writ or at the very least set this matter for an evidentiary hearing. In this regard, see Exhibit 1 at 13 (the OCCA denying motion for evidentiary hearing on post-conviction).

## GROUND THREE

**The jury selection process employed by the trial court violated Mr. Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

A defendant is guaranteed an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. *See, e.g.*, *Wainwright v. Witt*, 469 U.S. 412 (1985). Yet, in this case, Mr. Johnson was not afforded the same. During voir dire, the trial court removed a prospective juror for cause despite an insufficient record to justify that decision. This error alone resulted in a jury unqualified to fulfill the constitutional requirement of impartiality. *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968) ("[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.").

After both the trial court and the prosecution voir dired prospective jurors on their

ability to impose the death penalty, the prosecution moved to have Juror Reed[18] excused

for cause.  Notably, the defense had not yet questioned the jurors.

| | |
|---|---|
| MR. DRUMMOND | Juror No. 65, Ms. Reed.  As I recollect her testimony, she said that she could not impose the death penalty.  She didn't believe in it outside of what – unless the victim was either a family member, one of her children, or somebody that she knew.  I think she was quite clear on that. |
| THE COURT | Defense. |
| MR. SILVA | I don't think she was that clear.  I would like to have an opportunity to question the lady. |
| THE COURT | What is that you didn't find very clear, Mr. Silva?  Because, honestly, I thought she was unequivocal about the fact that she wasn't going to do the death penalty unless one of her family members was killed.  That was my understanding from her. |
| MR. SILVA | Well, I guess, maybe what I want is to offer her some other scenarios to consider.  Yes, you're right.  That's what she said.  I won't quarrel with the Court.  But I would simply ask for the opportunity to examine her.  While she drew a very narrow line, we've had other jurors say things, then after inquiry from both sides, they came back around. |
| THE COURT | Actually, noting your exception, Mr. Silva, I am going to deny your request and excuse Ms. Reed for cause.  I think she made it pretty clear. |

---

[18] Though Ms. Reed was only a prospective juror, the trial transcripts refer to her as Juror Reed.  *See, e.g.*, Tr. IV 803, 826-27, 841-43, 871-72.

45

> Going in to different scenarios, I don't think would be appropriate at this time and I will note your exception for the record, sir, and she will be excused for cause.

Tr. IV 871-72.

The record is shamefully void of testimony justifying Juror Reed's removal. The supposed cause for the removal was the objection and hesitation about the death penalty voiced by Juror Reed upon the prosecution's questioning. Yet, review of the record shows Juror Reed was not "unequivocal."

Prior to voir dire in this case, the prospective jurors were asked to fill out a Juror Questionnaire. On the Questionnaire, the jurors were asked their opinions on the death penalty, including (1) whether they favored the death penalty (question 31); (2) whether it is used too often, an appropriate amount, or too seldom (question 32); and (3) to what extent the death penalty should be imposed in first degree murder cases and whether the jurors could impose such a sentence in those circumstances (questions 33). On question 31 of the Juror Questionnaire, Juror Reed circled she was in favor of the death penalty. She went on to indicate on question 32 that the death penalty is used an appropriate amount. And, on question 33, she marked that she believed "the death penalty is appropriate in some first degree murder cases and [that she] could return a verdict resulting in death in a proper case." In each of these questions, Juror Reed was given the opportunity to announce her opposition to or reservation of the death penalty. Yet, she never did.

46

Even beginning at trial, Juror Reed continued to voice her ability to consider the death penalty.

| THE COURT | Ms. Reed, if you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments – death, imprisonment for life without the possibility of parole, or imprisonment for life – and weigh the aggravating circumstances against any mitigating circumstances to impose the punishment warranted by the law and the evidence? |
| JUROR REED | Yes. |

Tr. IV at 803.

It was not until Prosecutor Drummond questioned Juror Reed that she began to express any hesitations.

| JUROR REED | I have reservations just because I have children at home and I don't know if I could give 100 percent. |
| MR. DRUMMOND | And we'll get to that at another point in the questioning. But as far as the issue of the death penalty being a juror, what type of thoughts, if you have had any, about that? |
| JUROR REED | From Monday until now, yeah, this kind of scares me. Just, you know, sitting in this juror box and – and – just everybody hearing everything about me and everybody else in this room, all of our personal information that scares me a lot. |
| MR. DRUMMOND | Is it something or a task you think that you can do? |

| | |
|---|---|
| JUROR REED | No, not at all. |
| MR. DRUMMOND | Well, I'm going to come back in a second and maybe we'll talk a little bit more about that. |

***

| | |
|---|---|
| MR. DRUMMOND | Ms. Reed, on 31 [of the juror questionnaire] you had said that you were in favor of the death penalty and did not offer an explanation, and I don't know if that was an oversight, but. |
| JUROR REED | I said – |
| MR. DRUMMOND | Pardon? |
| JUROR REED | No, I said yes under some circumstances, I believe. |
| MR. DRUMMOND | What is your reasoning for the death penalty? |
| JUROR REED | I don't really believe in the death penalty. The only way that I would believe in the death penalty is if somebody hurt somebody close to me or one of my children and that's kind of where I stand with that. |
| MR. DRUMMOND | I'll get to your questionnaire in a second. |
| JUROR REED | I believe I checked, yes, under some circumstances. |
| MR. DRUMMOND | Well, it says, are you – and I wouldn't remember this, because it's been – you know, I don't remember what I did yesterday.<br>"Are you in favor of the death penalty?" You circled yes. And then on Question 32, it says, "In your opinion, is the death penalty used too often, an appropriate amount, too seldom. And you said an appropriate amount. |

48

And then it says, "Which of the following statements best represents your feelings about the death penalty?" And you said, "I believe that the death penalty is appropriate in some first-degree murders cases and I can return a verdict resulting in death in a proper case."
And as I listen to what you just said, it seems to me that a proper case would be something involving somebody that you knew or your children; is that correct?

JUROR REED            Correct.

MR. DRUMMOND           Now, my question for you would be, would you consider it in cases that didn't fit that category?

JUROR REED            No.  I just can't make that determination with someone I didn't know.

MR. DRUMMOND           Not at all?

JUROR REED            I don't think I can.

Tr. IV at 826-27, 841-43.

As soon as the prosecution had elicited a negative response, the questioning ceased by both the prosecution and the court.  And, the defense was given no opportunity to pursue questioning to rehabilitate.  The prompt dismissal of Juror Reed on a cursory record, without further questioning, violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Witherspoon*, 391 U.S. at 521-23.

When a record does not clearly establish that a prospective juror is unable to follow the law and his or her oath, a resulting sentence cannot stand. *Morgan v. Illinois*, 504 U.S. 719 (1992).  Indeed, removal for cause *of even one venire member* who has

conscientious scruples against the death penalty but is nevertheless able to set aside those scruples and consider the penalty of death and is therefore eligible to serve on the jury is error of constitutional magnitude not subject to the harmless error analysis. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987). Accordingly, it was imperative that defense counsel be allowed to question whether Juror Reed's reservations regarding the death penalty were so strong that regardless of the law, facts, and circumstances of the case she would not impose the death penalty.[19] *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (holding "the proper standard for determining when a prospective juror may be excluded for cause because of his or her view on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'") (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The defense was not afforded this opportunity.

The pattern of this case is not an unfamiliar one with this trial court. On more than one occasion, Judge Dana L. Kuehn has conducted voir dire of prospective jurors and

---

[19] While "the United States Supreme Court recognized that jurors who would *never* consider sentencing a defendant to death and jurors who would *always* vote for the death penalty for a first-degree murder conviction are both unfit to serve in a capital case," there is something fundamentally different in a prospective juror who believes that all first degree murderers should be executed and a prospective juror who believes that no one should be executed. *Miller v. State*, __ P.3d __, 2013 WL 4805683, *11 (Okla. Crim. App. 2013) (citing *Morgan v. Illinois*, 504 U.S. 719 (1992)). Even after rehabilitation during voir dire, the former's admitted inclination to impose capital punishment will forever shift the burden onto a defendant, even if the prospective juror eventually imagines a set of facts that might not support the death penalty in a first-degree murder prosecution.

proceeded to allow the prosecution[20] to do the same without also allowing the defense to voir dire the jurors before excusing them for cause. Recently, the OCCA has condemned this practice, granting relief for same. *See Miller v. State*, __ P.3d __, 2013 WL 4805683 (Okla. Crim. App. 2013).

In reviewing a claim that the trial court – Judge Dana L. Kuehn – "refus[ed] to give [defense] counsel any opportunity to question or attempt to rehabilitate prospective jurors who gave equivocal, confusing, or inconsistent answers regarding their willingness and ability to consider the death penalty," the OCCA in *Miller* determined the trial court had abused her discretion. *Id*. at *12, *17, *19. Like this case, Judge Kuehn excused prospective jurors for being unable or unwilling to consider the death penalty. *Id*. at *15. Despite the judge's – or the prosecution's – categorization otherwise, the jurors actually gave "equivocal, confusing, or inconsistent responses regarding their ability and willingness to consider the death penalty." *Id*.

Like here, some of the *Miller* jurors gave affirmations on their juror questionnaires that were inconsistent with the answers elicited during the prosecution's questioning. Others seemed to be genuinely conflicted with the "morally difficult and sometimes confusing questions at issue." *Id*. at *17. As to another, the record revealed but a mere

---

[20] Whether intentional or not, the trial court's practice seems to give deference to the prosecution. Prior to taking the bench, which occurred shortly before Mr. Johnson's trial, Judge Kuehn served as an assistant district attorney at the Tulsa County District Attorney's Office. The prosecutors on Mr. Johnson's case were senior attorneys at the same office and had previously maintained supervisory roles over her during her time at that office.

"nine words" to justify the court's dismissal. *Id*. at *16. The common denominator for them all was that the trial court never allowed defense counsel to question them. Just like Juror Reed, they were "never asked to explain the inconsistencies ... between [their] questionnaire answers and [their] in-court answers." *Id*. The OCCA found this practice an abuse of discretion.

> The importance of determining whether prospective jurors are eligible capital jurors dictates that when the record is unclear or inconsistent regarding the capital eligibility of a particular juror [such as Juror Reed], it is much more important to allow the parties to question that juror about his or her *eligibility* – whether he or she is able and willing to consider all three punishments options – than it is to allow the parties almost unbounded sentencing *voir dire* on other related topics.... While trial courts have broad discretion to set limits on party sentencing *voir dire* regarding other death-penalty related issues, trial courts must ensure that adequate *voir dire* is allowed in order to confidently and correctly determine whether individual prospective jurors are eligible capital jurors.

*Id*. at *17.

> [D]enying defense counsel any opportunity to question prospective jurors regarding their capital eligibility is particularly troubling when the State has been allowed to question these same jurors – especially when the State was able to successfully use its own *voir dire* questioning to convince the trial court to strike these jurors "for cause" (for being unable/unwilling to consider the death penalty), even though these jurors had already "passed" the trial court's own initial, capital-eligibility screening.

*Id*. Ultimately, the OCCA found Judge Kuehn's practices raised "serious due process and 8th Amendment reliability concerns." *Id*. at *18. She had never given the defense a "fair opportunity to question prospective jurors." *Id*. at *13.

The OCCA's determination in this case that Judge Kuehn did not abuse her

discretion was unreasonable and contrary to clearly established law.   The OCCA determined "on this record that the trial court did not abuse its discretion in declining defense counsel's request to further voir dire this prospective juror and in excusing her for cause after she had been asked the appropriate clarifying questions regarding her willingness to consider the death penalty, and her last recorded response indicated that she was not able to follow the law and consider the death penalty." *Johnson v. State*, 272 P.3d 720, 731 (Okla. Crim. App. 2012).   The record clearly speaks otherwise.   Juror Reed's last recorded response was an equivocal "I don't think I can."[21]   Tr. IV at 843. She was never asked appropriate clarifying questions – namely, whether she could set aside her reservations and follow the law.   She was never questioned on her inconsistent statements both at trial and on the Juror Questionnaire.   In short, the trial court chose to skip each of the necessary steps to insure a constitutional jury.   The rush through voir dire is also emblematic of the trial court's rush through the defense's mitigation case.   *See* Ground Two, *supra*.

When defense counsel objected to Juror Reed's removal and requested an opportunity to question her to determine whether she could actually follow the law and consider the death penalty if asked to set aside her feeling of opposition, the trial court

---

[21] Even when the last recorded answers of a prospective juror indicates he cannot consider the death penalty, courts have found trial judges to have abused their discretion in not allowing defense counsel an opportunity to further question the prospective juror.  It cannot be assumed that someone opposed to the death penalty cannot or will not follow the law. *See Boulden v. Holman*, 394 U.S. 478 (1969).

refused defense counsel's request.  As a result, the prospective juror was dismissed after only initial questioning by the court and the prosecution.  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (holding an essential part of the guarantee of a defendant's right to a fair trial is having a sufficient enough voir dire to identify unqualified jurors).  Without defense counsel being afforded the opportunity for rehabilitation of Juror Reed, there can be no confidence in the court's decision to remove her.  The trial court abused its discretion and the OCCA's failure to grant relief for same was unreasonable.  The Writ should issue.

## GROUND FOUR

**Trial and "appellate"[22] counsel failed to adequately investigate, develop, and present critical mitigating evidence.**

### A.   Introduction.

Every life has a story or narrative.  Raymond Johnson certainly had a narrative to his life, a social history to be told at the time of the sentencing stage of his trial.

---

[22] Post-conviction counsel argued Mr. Johnson's trial counsel and appellate counsel were not "separate" due to conflict of interest issues, and therefore her claims should essentially be viewed as direct appeal claims. PC at 4. *See also* Introduction (and Notice of Conflict of Interest Claim), *supra* at 1-6.  When referring to "appellate" or "direct appeal" counsel herein, Petitioner means both appeal counsel Curtis Allen and post-conviction "appeal" counsel Wayna Tyner.  Both counsel were charged with raising each and every instance of counsel's ineffectiveness as well as all errors existing both in *and outside the record*. *Evitts v. Lucey*, 469 U.S. 387 (1985); ABA Guidelines § 10.8(A)(3)(b)-( c), (B)(1).  Indeed, appellate/collateral counsel must conduct an aggressive, thorough and *independent* investigation of all aspects of the case and cannot rely on what was done before the case came to them. *See e.g.,* ABA Guideline 10.15.1 at 1079, 1085; 1.11, cmt. (2003).

However, it was not told.  This was an injustice.  As one commentator has noted:

> Social histories ... are not excuses, they are explanations. ... [N]o jury can render justice in the absence of an explanation. In each case, the goal is to place the defendant's life in a larger social context and, in the final analysis, to reach conclusions about how someone who has had certain life experiences, been treated in particular ways, and experienced certain kinds of psychologically-important events has been shaped and influenced by them.
>
> ...
>
> The principle that a sentencer's "possession of the fullest information possible concerning the defendant's life . . ." [n.125] is essential to the selection of the appropriate penalty predates the modern era of capital jurisprudence and has never been restricted exclusively to death penalty cases.
>
> > n.125  *Lockett v. Ohio*, 438 U.S. 586, 603 (1978)(quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).  The *Williams* Court stated:
> >
> > > The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender .... [A] strong motivating force for [these] changes has been the belief that by careful study of the lives and personalities of convicted offenders many could be less severely punished and restored sooner to complete freedom and useful citizenship. This belief to a large extent has been justified. *Williams*, 337 U.S. at 247- 49. The Court in *Williams* also quoted Judge Lewis Schwellenbach to the effect that: "The knowledge of the life of a man, his background and his family, is the only proper basis for the determination as to his treatment. There is no substitute for information." *Williams*, 337 U.S. at 249-50 n.14.

Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 Santa Clara L. Rev. 547, 560-61, 603-04 (1995) (footnote 126 omitted).

The Tenth Circuit understands this and has stated it is "compelled to insure the sentencing jury makes an individualized decision while equipped with the fullest information possible concerning the defendant's life...." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (citation and internal quotation marks omitted). It further stated it must "scrutinize carefully" any decision by counsel which keeps the sentencer from hearing all mitigation evidence. *Id.*

Speaking of scrutinizing carefully, it is no secret the United States Supreme Court deems effective assistance of counsel of paramount importance. Indeed, just last year it called it "a bedrock principle in our justice system." *Martinez v. Ryan,* __ U.S. __, 132 S.Ct. 1309, 1317 (2012). Time after time the Supreme Court has granted relief to defendants who received ineffective assistance of counsel ("IAC"). Here, the case presented on Mr. Johnson's behalf at his sentencing was that his "life, based upon his conduct when he was previously in prison, is capable of redemption and ... value." Tr. X at 1976. The lone theme presented to the jury was that Johnson could do good if allowed to live. So much more could have been, and should have been, presented. Raymond Johnson's counsel were ineffective.

**B.     The minimal defense effort.**

The defense reserved its opening statement in the capital sentencing proceeding until after the State presented its evidence in aggravation and victim-impact evidence. Tr. X 1973. When the defense did give its opening statement, counsel gave lip service only

to the idea the jury would receive a fully realized mitigation presentation.   Counsel advised the jury that a "person is a sum of all their experiences" and they would meet the "whole Raymond."   Tr. X 1975-76.   Sadly, the defense in no way followed up on that premise, leaving the jury to wonder why.

The defense did not make any attempt to answer the "why" question; that is, why did the crime occur.   Nor did they attempt to answer the "how" question, i.e., how could Johnson have committed the crime.   Nor did they attempt to answer the "who" question, i.e., tell who Raymond Johnson is by presenting his life history.   Nor did the defense answer a host of mitigating questions that they could have answered had they adequately investigated and made sound decisions upon an adequate investigation.   Instead, a lone premise was presented that Raymond Johnson's "life, based upon his conduct when he was previously in prison, is capable of ... value."   Tr. X 1976.

The witnesses presented were a sister, a friend, two prison inmates, four ministers, and a minister's wife.   The scope of their testimony was limited, and the witnesses were wholly inadequate to address the many different grounds for mitigation that existed.

### Artina Johnson

The first witness was Artina Johnson, Raymond Johnson's little sister and true biological child of Arthur and Linda Johnson.   The purpose of much of her testimony seemed to be making up for the absence of the other members of their family.   Indeed, their absence from the witness stand had to be glaring and obvious to the jury.   In this

vein, she testified that their sister Michelle was hurt because of the effect of the crime on her children. Tr. X 1982-83. She called Raymond a "hardheaded son," but allowed that he and their mother loved each other. Tr. X 1983-84. She said Raymond's relationship with their dad "wasn't a bad relationship," that they loved each other, and that Raymond and their grandmother were close. Tr. X 1985-86. She said Raymond's family members would be detrimentally affected if he were executed. Tr. X 1997. In no way did this make amends for their absence.

Other than that, her testimony was geared toward the introduction of defense exhibits (three family photographs and the 30-second CD recording clip of Mr. Johnson singing in a church band in prison), and furthering the lone defense theme that the last time Mr. Johnson was in prison for killing someone he was a positive presence, so he should be allowed to live so he can again be a positive presence.[23] She said Raymond got more involved in the church when he went to prison. Tr. X 1993-94. She testified that Raymond "tried" to sing (and "tried" to play the keyboard) at their father's church, and eventually got better at singing when he was in prison, though he was never as good as she was. Tr. X 1991-92. She said Raymond "spearheaded" some events at the prison

---

[23] Artina Johnson did testify that Raymond had a temper if he was pushed, but when he got mad he would walk away. Tr. X 1991-92. On cross-examination, too, she testified that one time when he was most upset he walked five miles home to avoid further confrontation. Tr. X 2001. Unfortunately, counsel did not follow up on this with Artina or with the numerous friends and family that would have testified to this ingrained mechanism of Raymond Johnson for dealing with anger. *See, e.g.,* Exhibit 6 at 2; Exhibit 29 at 2 *see also infra* at subsection (G)(5), "Attempt at Anger Management."

church, which she personally observed.  Tr. X 1994.  On cross-examination, the prosecution elicited that Artina thought Raymond had a good childhood, was involved in the church, and knew right from wrong.  Tr. X 1998-99.

### Cory Gibson

Cory was a longtime friend of Raymond Johnson who met him in a youth church choir, became involved in prison ministries with Raymond after Raymond went to prison, and assisted Raymond's activities with prison choirs.  Tr. X 2006-09.  Cory heard Raymond sing and preach in prison.  Tr. X 2012.  On cross-examination he said Raymond knew right from wrong, but was able to reiterate that Raymond was consistent in organizing and planning and could be relied on.  Tr. X 2014-15.

### Charles Wymond Shaw

Mr. Shaw is an inmate convicted of First Degree Murder who testified that Raymond directed a choir called Seekers of Refuge while at the Lexington Assessment & Reception Center.  Tr. X 2018-19.  Mr. Shaw became a member of the choir after being asked to join by Raymond.  Tr. X 2019.  He testified Raymond was "a light" to the other inmates, and a caring, giving person who would do "anything he could for you."  Tr. X 2020-21.

### Chaplain Larry Adams

Mr. Adams was the senior chaplain at Lexington Assessment & Reception Center, and talked about Mr. Johnson's prison church choir, the Seekers of Refuge, as well as his

participation in the three different activities hosted by the National Association of Blacks in Criminal Justice. Tr. X 2024. Raymond was "very effective" with the choir, and workshops held in conjunction with the choir. Tr. X 2025. Johnson had contacts with black churches in the state and was "good at organizing things and making sure everything happened when it was supposed to happen." Tr. X 2028. He was a recognized leader who completed the tasks that were given to him and was always on time. Tr. X 2030.

Pastor Cynthia Petties

Cynthia Petties is the pastor of Liberty Abundance Full Gospel Ministries, and Raymond Johnson had a "very awesome" impact on her ministry. Tr. X 2035. Raymond contacted her church and made it possible for the church to become involved with Lexington Assessment & Reception Center. Tr. X 2035. Raymond's work increased attendance at her services and helped grow her ministry. Tr. X 2035-36.

Marty Christopher Williams

Like inmate witness Charles Wymond Shaw prior to him, inmate witness Marty Christopher Williams was also convicted of murder. Tr. X 2038. Through Raymond's help and encouragement, Mr. Williams was able to get back in contact with his family. Tr. X 2039. Raymond even had his "Papa" Reed look out for Mr. Williams' children. Tr. X 2039-40. Raymond was also heavily involved in a program entitled "Speak Out," which was described as an evolution of the "Scared Straight" program. Tr. X 2040-41.

Raymond was so adept and outstanding in this program that kids involved in it would think he was a trained counselor rather than a prison inmate.  Tr. X 2041.  He had a positive influence in kids' lives.  Tr. X 2041-42.  Raymond was also involved in an a capella singing group called Two Lights.  Tr. X 2042.

### Reverend Vernon Burris

Reverend Burris met Raymond when Raymond worked shining shoes at the barber shop at Lexington.  Tr. X 2048.  Reverend Burris had a ministry at Lexington, and Raymond was on the Praise Team and assisted and helped get people to attend.  Tr. X 2050-51.  Everyone in the entire prison system liked him because he was joyful, easy to talk to, and a motivator to get people involved in prison ministry.  Tr. X 2051.

### Linda Reed

Linda Reed is Pastor Reed's wife and is like a second mom to Raymond.  Tr. X 2056-57.  She spoke of Raymond's sermons and a radio interview and his ministry with the Oklahoma Baptist State Convention Prison Ministry.  Tr. X 2057.  He was very persuasive and did a good job.  Tr. X 2058.

### Pastor James Edward Reed

Pastor Reed and his wife "sort of adopted" Raymond Johnson as a son.  Tr. X 2069.  At district church meetings, Raymond would assist however he could and the younger people at the church "fell in love with him also."  Tr. X 2071.  When he went to prison on the manslaughter charge, he matured and grew into more of a lieutenant in the

church.  Tr. X 2072-73.  He observed Raymond preach and sing and write poetry.  Tr. X 1073.  When Raymond moved to Tulsa, he began to change and Pastor Reed could sense that something was not right.  Tr. X 2074.

Closing argument

Defense counsel's closing argument in the capital sentencing stage takes up less than one-and-a-half transcript pages.  Tr. X 2098-99.  Counsel offered that Mr. Johnson has "an opportunity for redemption."  Tr. X 2099.  He offered that Mr. Johnson "can still contribute to society."  Tr. X 2099.  He reiterated "[i]n all frankness" that Raymond Johnson belongs in prison.  Tr. X 2099.  He offered a mere "glimmer" of hope that his example may be wanted.  Tr. X 2099.  He asked the jury to show compassion and mercy–"exactly that which he denied to Brooke and Kya."  Tr. X 2098.

Counsel failed to describe to the jury what the defense had presented in mitigation.  Counsel failed to argue Mr. Johnson has shown when in prison he spends his time helping and ministering to other inmates and being a positive influence and role model and, therefore, would not be a continuing threat to society.  Counsel failed to humanize Raymond Johnson to the jury.  Indeed, counsel did not say a single word about Raymond Johnson's life.

**C.      Investigation and mitigation failure addressed on post-conviction "appeal."**

Nothing was mentioned about the second stage presentation on direct appeal, not a single word nor cite to the transcript.  Even the factual summary gave the OCCA nothing

but unflattering facts about the crime. DA at 1-6. Because the Tulsa County Public Defender's Office did no outside-the-record investigation on appeal, and a serious conflict of interest existed, post-conviction counsel rightly argued trial and appellate counsel should not be considered separate. PC at 4. As discussed elsewhere in this petition, the post-conviction stage was indeed Mr. Johnson's appeal regarding these matters.

Post-conviction counsel argued counsel was ineffective for "failure to adequately investigate, develop, and present mitigating evidence." PC at 20. Post-conviction counsel noted even a "very brief" investigation would have revealed the witnesses and evidence she had uncovered. PC at 31. The evidence that should have been investigated, developed, and presented was detailed as follows:

> Raymond Johnson was one of three children born to Ms. Linda Bell Johnson. Ms. Johnson has had health problems over the years, including lupus and cancer. (Attachment 5 ¶¶4-6, 10)
>
> All of Ms. Johnson's 3 children had different fathers. Raymond's oldest half-sister, Michelle, was born when their mother was around 18 years old. (Attachment 5 ¶¶6, 10) Just over a year later, on March 26, 1974, Raymond was born. (Attachment 5 ¶6; Attachment 6 see attached TuCoPD 6740)
>
> Raymond's biological father, Artura Hamilton, recalls that he met Raymond's mother at a friend's house where Mr. Hamilton occasionally stayed. They began dating and he often stayed at her house. He knew she had a child but the child never lived with her when he was present. He did not even know the child's gender. During this time, Mr. Hamilton did not have regular employment but instead worked odd jobs. He stayed with Raymond's mother because "she had a job and a car." (Attachment 7 ¶5)
>
> Raymond's mother recalls that she met Raymond's father at church where

she and Mr. Hamilton's mother attended. At the time, Mr. Hamilton was on parole for a 2nd degree murder conviction from Missouri. He had been convicted in August of 1964 and sentenced to 12 years in prison. In the last days of 1969, he was released from state custody and placed on supervised parole. He was later discharged from parole in August of 1973. (Attachment 5 ¶7; Attachment 7 see attached TuCoPD 5323, 5396)

While Mr. Hamilton and Raymond's mother were dating in 1973, Mr. Hamilton was arrested, and later convicted of 1st degree rape receiving a 20 year sentence, and 1st degree robbery receiving a 30 years with both sentences to be served consecutively. In that case, the State issued a subpoena for Ms. Johnson's (then, Ms. Linda Bell) testimony because he used her car in order to commit the crimes. However, she cannot recall if she ever had to testify against him. (Attachment 5 ¶¶7, 8; Attachment 7 see attached TuCoPD 5547-48; 5327; 6204)[24]

Once Mr. Hamilton was arrested, Raymond's mother "cut all ties to him because if he could disrespect me like that I did not want anything to do with him." They dated for less than a year. Although she was unaware of it at the time of their separation, Ms. Johnson was pregnant with Raymond. Raymond met his father 1 time; however, he was too young to remember it. Unbeknownst to Ms. Johnson, Raymond's paternal grandmother took him to the prison to visit his father when he was about 2 years old. Once she found out, she cut off all ties between Raymond and his father's family and he did not have any more contact with them. Raymond did not learn "about his biological father until much later in life." (Attachment 5 ¶¶7-9; Attachment 6 see attached TuCoPD 6740)

Eventually, Mr. Hamilton discharged his 1st degree rape and 1st degree robbery sentences in 1991. (Attachment 7 see attached TuCoPD 5545) However, in 1999, Mr. Hamilton was convicted of Assault with Intent to Commit Rape AFC Two or More Felonies and sentenced to 35 years. While that case was pending, he was found incompetent to stand trial and spent more than 2 years at Eastern State Hospital. This was Mr. Hamilton's second admission to Eastern State Hospital. His 1st admission was in 1979. (Attachment 7 see attached TuCoPD 5600-01; 5585-88; 5313-15)

---

[24] In February of 1973, Mr. Hamilton was acquitted on a 1st degree rape allegation that he allegedly committed in October of 1972. (Attachment 7, TuCoPD 6056, 6070)

When Mr. Hamilton was discharged from the hospital in 1997, he was given an axis I diagnosis of depression with psychotic features. Mr. Hamilton is currently in DOC custody serving his 35 year sentence. (Attachment 7 see attached TuCoPD 4902; 5585-88)

While his biological father was having legal problems and suffering from mental illness, Raymond grew up believing his step-father, Bishop Arthur Johnson, was his father. The Bishop and Raymond's mother married when Raymond was about 3 or 4 years old. Raymond's youngest half-sister, Artina, was born shortly thereafter. The Bishop raised Michelle and Raymond as his own. The Bishop still considers Raymond as "my son." At the age of 6, Raymond began preaching. "He has a real gift." (Attachment 5 ¶10; Attachment 8 ¶¶2, 4)

While growing up, Raymond and Michelle were very close. Raymond was a happy and well-adjusted child until about the 6th or 7th grade. His mother was the primary care-giver of the children since the Bishop spent most of his time with church business. (Attachment 5 ¶¶10-11)

Raymond began getting into trouble during his junior high school years. When he got into trouble at school, his mother would get him transferred to another school since she worked for the school district. He and his cousin, Micah Maxwell, also began committing crimes, such as burglaries. Mr. Maxwell is currently incarcerated. Raymond also became involved with a gang. One time, Raymond brought stolen property into the house. Once his mother realized it, she called the police hoping that early intervention would deter Raymond from getting into bigger trouble down the road. Unfortunately, the police did not do anything. His mother thinks Raymond committed crimes and joined the gang in order to get attention and because of peer pressure. (Attachment 5 ¶¶11, 12)

In 1990, Raymond's mother and step-father divorced. During the separation and divorce, Raymond lived with his step-father. Feeling as though he was in the "cross-fire" between his parents, he moved back in with his mother; however, he and his mother did not get along very well. As a result, several times he would move between his mother's home and living with friends. (Attachment 6 see attached TuCoPD 6740)

In 4 years, Raymond attended 4 different high schools until he finally withdrew early 1992 during the 11th grade. He received average grades in

the 9th grade but his grades declined thereafter, around 1990 when his parents divorced. (Attachment 6 see attached TuCoPD 6741)

Raymond eventually wound up in prison. Throughout his incarcerations, he was written up for a total of 4 misconducts. In July of 1993, he escaped from the Tulsa Community Corrections Center (TCCC) and was apprehended the following day. In April of 1994, he committed a battery of another person. In June of 1997, he committed a battery of staff/no bodily harm and possession of unauthorized money. He had no other misconducts. He earned his GED; completed many programs; and he earned outstanding work performance evaluations while serving his time. (Attachment 6 see attached TuCoPD 6663-67, 6979, 7221, 7265)

From 1994 to 1998, Ms. Tina Osborn was a sergeant at the TCCC. She was also a disciplinary chairperson. In that capacity, she conducted hearings on inmate misconducts. In her experience at TCCC, escapes usually occurred in a non-violent manner, such as by walking off or crawling through a window. Also, in her opinion and based upon her experience working for DOC, "it is very good behavior for an inmate to only have 4 misconducts in 10 years." (Attachment 9 ¶¶2-4, 6)

Raymond also got involved in prison ministry while he was incarcerated. When he started preaching, Raymond's "second parents," Linda and James Reed, worked to help him develop his talents. His mother continued to visit and support him when she could. (Attachment 8 ¶5; Attachment 5 ¶¶13, 15)

In 2005, Raymond was released from prison and went to live with his mother in Oklahoma City. Artina and her daughter were also living there at the time. His mother told him he had to get a job and eventually begin paying a part of the rent as his sister did. His mother also had rules that both of her children had to live by. (Attachment 6 see attached TuCoPD 7270; Attachment 5 ¶¶13, 14, 15)

Also, a few weeks after he was discharged, Raymond began to preach again. He preached at a church in Spencer and participated in the ministry on a radio program. His mother described his preaching style as "conversational." (Attachment 5 ¶15)

Looking back at that time, the Bishop recalls, "[W]hen Raymond got out of prison and was out in the world he was torn between his old life in the

world and his new life in Christ and his responsibility as a preacher. I wasn't there to help Raymond. . . .He didn't have anyone to guide him. If I had been there as Raymond's mentor, things would have been very different." (Attachment 8 ¶6)

Raymond lived with his mother and sister for about a month until he moved in with a friend. He later moved to Tulsa. (Attachment 5 ¶16)

While in Tulsa, Raymond began dating Jennifer Walton. He met one of Ms. Walton's good friends, Laura Hendrix, and they quickly became friends. "Raymond was a great guy, he always had a job, always dressed well, and was very nice. He was a hard worker and went to church all the time. He seemed to live his faith." Ms. Hendrix spent a lot of time around Raymond until he met and began dating Brooke Whitaker.

Raymond brought Ms. Whitaker to his mother's house in Oklahoma City and introduced them. His mother met her another time while at Artina's house. Artina was doing Ms. Whitaker's hair. (Attachment 5 ¶17)

Once he and Brooke split up, Raymond had nowhere to go so he lived in a homeless shelter in Tulsa. Ms. Hendrix and her husband visited him there. "Raymond was in a bad way. He was a different person. He was just kind of lost. He had a bad cut on his arm. It became apparent that it was a suicide attempt and he was still suicidal." Ms. Hendrix and her husband decided to let him live with them. "Raymond truly loved Brooke and the baby. When he lost them he was a different person. He was not the same. He was lost and mentally broken." Raymond lived with Ms. Hendrix and her family for less than 2 weeks when he was arrested in this case. (Attachment 10 ¶¶3-7)

Raymond's mother continues to correspond with Raymond. She sat through Raymond's capital trial and heard all of the evidence against him in this case. She also knows of his prior convictions and other mischief he got into as a teenager and young adult. However, if she had been called to testify, she would have told the jury that she still loves him and his life has meaning to her. She does believe that he deserves to be punished severely, such as spending the rest of his life in prison; "however, I do not want him to be executed. It will be very difficult if he is executed." (Attachment 5 ¶¶19, 20)

Even though Raymond could, and did get into trouble, there is a part of his

personality that is the best of the best. "If you knew Raymond, you loved him. He was very personable..." He and his youngest sister were both out-going, especially at church. Raymond's mother still has people ask about him and how he is doing. (Attachment 5 ¶18)

Raymond and his step-father continue to correspond with each other. "Raymond is still an important part of my life. I love him and do not know what I will do if he is executed." (Attachment 8 ¶8)

Ms. Hendrix would have testified on Raymond's behalf in the sentencing stage if asked. She "still loves Raymond and he is still an important part of her life. It will be very difficult if he is executed." (Attachment 10 ¶¶8-9)

PC at 24-30.

**D.      Clearly established law.**

Counsel has an affirmative duty to investigate all reasonably available mitigation evidence. *See e.g., Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 369 (2000). In *Williams*, counsel presented ***some*** mitigating evidence but was deemed ineffective for not discovering and presenting ***more***, and the Court granted relief although the omitted mitigation would apparently neither undermine nor rebut the prosecution's death eligibility case. *Id.* The Court found prejudice even though Mr. Williams brutally murdered a friend for a few dollars, and also despite the evidence of Williams' history of vicious assaults on the elderly (leaving one elderly woman in a vegetative state; setting fire to an elderly victim's home), his commission of another arson (setting the city jail on fire) while awaiting trial, the stabbing of a man during a robbery, and Williams' confession to having strong urges to choke and otherwise assault other inmates while incarcerated. *Id*. at 367-69, 399, 418. A wealth of extremely strong

evidence was presented that Williams would pose a "serious continuing threat to society." *See, e.g., id.* at 368-69.

While general deference is to be given to trial counsel's performance, the courts do not allow such deference to negate the requirement that counsel perform adequately. *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). *See also Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) (noting counsel's duties must be "strictly observed"); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003); *Fisher v. Gibson*, 282 F.3d 1283, 1290-91, 1294-1301 (10th Cir. 2002); *Stouffer v. Reynolds*, 168 F.3d 1155, 1165-68 (10th Cir. 1999); *Anderson v. Sirmons*, 476 F.3d 1131, 1141-42 (10th Cir. 2007).

A showing of a reasonable probability of prejudice separates the insignificant errors from those that affected the outcome. *Strickland*, 466 U.S. at 695 (rejecting tests of "beyond a reasonable doubt," "by clear and convincing evidence," and "by a preponderance of the evidence" as too stringent). If confidence in the sentence is undermined, prejudice is established, and relief should be granted. *Id*. at 694. Only one juror need be affected. *Wiggins,* 539 U.S. at 537.

### E.    The unreasonable ruling by the OCCA.

The OCCA made several omissions of fact, unreasonable determinations of fact, and unreasonable determinations of law in denying Mr. Johnson's claim counsel was ineffective for "failure to adequately investigate, develop, and present mitigating

evidence." PC at 20. De novo review should follow. *See* 28 U.S.C. § 2254(d)(1) and (2).

It should be noted the OCCA was concerned enough by Mr. Johnson's post-conviction claim that it took the unusual step of ordering the State to respond to it. PC Order filed May 14, 2012. The OCCA initially characterized Mr. Johnson's claim as a complaint that the second stage presentation "failed to present a different side of him than that which they had seen in [the] first stage - one that would allow the jury to consider the potential value of his *life as a whole*," and further that witnesses who could have offered "compelling testimony" or added to the argument his life was worth sparing were not called to testify. Exhibit 1 at 9 (emphasis added).

However, the OCCA quickly forgot about Raymond's "life as a whole" and the importance of a jury receiving the "fullest information possible concerning the defendant's life," *Lockett,* 438 U.S. at 603. Rather than discussing all the different kinds and purposes of the evidence presented on post-conviction, or addressing the lessons of *Lockett* and its progeny, the OCCA unreasonably disposed of the claim as follows:

> Some of the evidence he contends these witnesses could have presented was actually introduced through the testimony of other witnesses who did testify. For instance, although Jonson's [sic] mother did not want to testify in mitigation and was not called to do so, Johnson's sister testified that Johnson had grown up with and still had strong family support and that her mother loved Johnson and had visited him in prison. She also testified that if Johnson were sentenced to death it would be detrimental to her mother. Although Johnson's step-father, Arthur Johnson, did not testify, Johnson's sister testified that he, too, loved and supported Johnson.

> While the failure to call some of these potential witnesses precluded the jury from hearing first-hand some positive accounts of Johnson's life, it also

precluded the jury from hearing some negative testimony about Johnson such as testimony about his earlier contacts with the police and his possible gang affiliation as a teenager. The decision not to persuade Johnson's mother to testify kept the jury from hearing her opinion that "It is like Raymond has two (2) personalities. He would be the best of the best and then be the worst of the worst."

Johnson has not shown that trial counsel did not know of both the good and the bad that the potential witnesses had to offer. Nor has he shown that the decision not to call each of these witnesses constituted deficient performance of trial counsel. Finally, Johnson has failed to meet his burden of showing that the failure to call the omitted potential mitigation witnesses was prejudicial. As Johnson has not shown that trial counsel's performance regarding the investigation and development of mitigating evidence was deficient or that he was prejudiced by the alleged failings of trial counsel; we cannot find that appellate counsel was ineffective for failing to allege otherwise on direct appeal. *See Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Exhibit 1 at 9-10. The problems with this analysis are myriad.

For one thing, the analysis only addresses a fraction of the evidence presented on post-conviction, and mischaracterizes it as pertaining to "positive accounts of Johnson's life." Exhibit 1 at 10. Witnesses are skipped entirely, and notably absent is any reference to the *documentary* evidence presented on post-conviction.

Take the documentary evidence regarding Mr. Johnson's biological father, Artura Hamilton, for example. He has been convicted of a myriad of felonies, for crimes such as robbery, rape, kidnaping, and murder, and has been found to be delusional, paranoid, and floridly psychotic. PC Att. 7, TuCoPD 04820-06204. As well as sharing genes with Raymond Johnson, he also shares similar childhood trauma:

[Artura] states that in the atmosphere in which he lived he never felt

71

wanted, loved, nor did it seem like a home.  The families of friends whom he ran around with seemed more concerned about him than his own mother.[25]

PC Att. 7 at TuCoPD 05407.  One juror may have believed Raymond Johnson, through no fault of his own, inherited genetic traits or predispositions from his father and should be considered less culpable as a result.[26]  Unfortunately, the jury was left in the dark and not given the "fullest information possible." *Lockett*, 438 U.S. at 603.

Petitioner can hear the State respond that the Artura Hamilton evidence is "double-edged."  Respondent, and the OCCA, put far too much emphasis on the possible or theoretical double-edged nature of evidence in general, and certainly the evidence in this case.  For example, it should be quite obvious that in a case like this, with the kind of aggravating facts already known by the jury, the bad edge of the sword is less of a concern.  *See, e.g., Evans v. Secretary, Department of Corrections,* 703 F.3d 1316, 1342 (11th Cir. 2013) (Martin, J., dissenting) (finding "jury was already well-acquainted with

---

[25] Compare this to the atmosphere in which Raymond lived:

> [Raymond's mother] was not affectionate. [She] yelled at Raymond all the time.  She kicked Raymond out of the house.  [He] has always craved attention from women.  He wanted a place to feel wanted and needed.  He never got this from his mother.

Exhibit 6 at 1-2.

[26] Raymond may have inherited, through no fault of his own, genetic traits or predispositions from his mother as well.  As just one example from his mother's side of the family, it is known that Raymond's maternal grandfather was convicted of shooting a police officer in Oklahoma City.  *See* Exhibit 7, Oklahoman newspaper articles regarding Lloyd James Bell.

the aggravating edge of the sword"). The Tenth Circuit is *clearly* familiar with this concept. *See, e.g., Smith v. Mullin,* 379 F.3d 919, 942-44 (10th Cir. 2004); *Anderson v. Sirmons,* 476 F.3d 1131, 1146-48 (10th Cir. 2007). The jury already knew the "worst" of Raymond Johnson. Exhibit 1 at 10.[27] It was unreasonable for the OCCA to think otherwise.

As noted above, the OCCA mischaracterized the post-conviction evidence as dealing with the "positive accounts of Johnson's life." Exhibit 1 at 10. To the contrary, there was much presented that was not positive, but ***explanatory.*** It was explanatory both of Mr. Johnson's life history, and of the context under which the crime was committed. Some examples:

- Foreshadowing her treatment of Raymond Johnson, and illustrative of her pattern of cutting people off, Linda Johnson cut all ties and contact with Raymond's biological father *and his entire family* before she even gave birth to Raymond because "if he could disrespect me like that I did not want anything to do with him." PC Att. 5 at ¶9.

- Raymond did not learn "about his biological father until much later in life." PC Att. 5 at ¶9.

- When Raymond would get in trouble in school, his mother would just

---

[27] This dispels the OCCA's unreasonable conclusion that counsel's decision not to put Raymond's mother on the stand was a sound strategy decision. Exhibit 1 at 10. This is especially true since the OCCA well knows the crucial importance of a mother's testimony as mitigation evidence in a death penalty case. *See Coddington v. State*, 142 P.3d 437; 458-50 (Okla. Crim. App. 2006); *Warner v. State*, 29 P.3d 569, 574-75 (Okla. Crim. App. 2001). "The humanizing effect of live testimony in the form of a mother testifying for her son as mitigation evidence in a capital murder trial cannot seriously be disregarded ...." *Coddington*, 142 P.3d at 459.

transfer him to another school.  PC Att. 5 at ¶12.

- Raymond was caught in the crossfire of his mother and step-father's divorce (which took place when he was an impressionable adolescent), living with his step-father at first, then his mother; he could not get along with his mother and things got so bad that he moved out of the house and lived with friends several times.  PC Att. 6 at TuCoPD 06740.

- Raymond's step-father Bishop Johnson knew Raymond was "torn between his old life in the world and his new life in Christ and his responsibility as a preacher. ... If I had been there as Raymond's mentor, things would have been very different." PC Att. 8 at ¶6.

- Once he and Brooke Whitaker split up, Raymond had nowhere to go so he lived in a homeless shelter in Tulsa. Laura Hendrix and her husband visited him there. "Raymond was in a bad way. He was a different person. He was just kind of lost. He had a bad cut on his arm. It became apparent that it was a suicide attempt and he was still suicidal."... "Raymond truly loved Brooke and the baby. When [Brooke and Raymond broke up] he was a different person. He was not the same. He was lost and mentally broken."  PC Att. 10, ¶¶3-7; *see also* Exhibit 8, Affidavit of Laura Hendrix; Exhibit 9, Affidavit of Cory Gibson.

Evidence such as detailed above could have provided some context for the life of Raymond Johnson, and some explanation for why the crime happened (which jurors crave for many reasons).  One juror may have needed that context.  For one juror or more, it could have made a difference.  Yet at trial, the jurors were never given an explanation for what happened by Mr. Johnson's trial team.  Instead, they were just told about the positive things Raymond did the last time he was in prison for killing someone.

The OCCA only partially examined the evidence presented on post-conviction. For example, the OCCA ignored all evidence not related to the positive worth of Mr. Johnson's life.  The OCCA also ignored all documentary evidence.  And importantly, the

OCCA utterly failed in its duty to "scrutinize carefully" any decision by counsel which keeps the sentencer from hearing all mitigation evidence. *Mayes,* 210 F.3d at 1288. *See also Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001) (stating courts should apply even "closer scrutiny" when reviewing attorney performance during the sentencing phase of a capital trial).

Instead of careful scrutiny and concern that the jury receive the fullest information possible, the OCCA incompletely and flatly held instead that, in regard to the potential witnesses, Mr. Johnson had not sufficiently proven deficient performance or prejudice to the OCCA's satisfaction. Exhibit 1 at 10. This analysis only examined part of the evidence presented (the evidence pertaining to potential witnesses), then the court parsed its analysis even further by jumping to the question of burden of proof, almost as if the placement of the burden of proof on Petitioner was the determinative factor in its decision. Close, careful scrutiny does not jump to conclusions, nor does it jump to conclusions based on mere unsupported assumptions.

Also, if the *trial-counsel* ineffective assistance of counsel claim is somehow considered defaulted, see Precautionary Statement Concerning Procedural Default, *infra*.

Surely with all the evidence attached to the post-conviction application Petitioner's burden was met in all respects. If not, then *at the very least* an evidentiary hearing should have been granted Mr. Johnson. This is especially true since the OCCA has stated that its standard for granting capital evidentiary hearings is ostensibly "less demanding" than

was once thought.  *Simpson v. State*, 230 P.3d 888, 906 (Okla. Crim. App. 2010).  The

OCCA's handling of the claim was wholly unreasonable.

### F.   Subsequent enhancement.

Evidence gathered by habeas counsel reinforces further the trial and "appellate"[28]

counsel's failings.  As habeas counsel began to easily uncover all kinds of mitigating

evidence regarding Raymond Johnson's life, they saw he experienced numerous different

kinds of trauma.  As such, they retained trauma specialist/clinical psychologist Victoria

Reynolds, Ph.D.  Her C.V. is attached as Exhibit 10.

Dr. Reynolds produced a poignant report providing details of Mr. Johnson's

traumatic life history, and assessing the scope, intensity, and impact of various traumatic

life experiences on Mr. Johnson's development and subsequent behavior.  It is attached as

Exhibit 11.  The outline for the report is as follows:

> Psychological Report of Trauma and Its Impact: Raymond Johnson
> Part I.
> > Qualifications
> > Referral Questions and Bases For Opinion
> Part II. Psychosocial History as It Relates to Trauma
> Part III. Description of Traumatic Life Experiences
> > 1.   Early Attachment Disruption
> > 2.   Traumatic Emotional Neglect
> > > a.   Failure to Protect
> > > b.   Indifference & Favoritism
> > > c.   Exposure to Addiction
> > > d.   Gambling and Impulsivity

---

[28] When referring to "appellate" or "direct appeal" counsel herein, Petitioner means both appeal counsel Curtis Allen and post-conviction "appeal" counsel Wayna Tyner.

        e.       Abandonment of Parental Role and Oversight
    3.    Physical Abuse
        a.       by mother
        b.       by father
    4.    Exposure to Marital Discord and Hostility
    5.    Parental Betrayal and Abandonment
    6.    Disclosure of Paternity
    7.    Exposure to Violence in Gang
    8.    Adolescent Exposure to Inappropriate Sexual Boundaries & Sexual Assault
    9.    Adult Rape
Part IV. Unique Impacts of Sexual Abuse and Rape on Males
    1.    Recognition of Male Sexual Abuse and Difficulty with Disclosure
    2.    Masculinity & Hypermasculine Behaviors
    3.    Homophobia & Concerns About Sexual Orientation
Part V. Immediate and Long-Term Impacts of Repeated Abuse in Childhood
        The Neurobiology of Trauma Exposure
        Dysregulations in Responding: Emotional Numbing & Flooding
        Substance Abuse
        Distortions in Learning Cause & Effect/Right & Wrong
        Impaired Attachment
        Adult Impairment in Interpersonal Relationships
Part V. Conclusions

Exhibit 11 at 1.

At 35 pages, Petitioner cannot reproduce in this Petition every trenchant observation and finding made. The report should however be carefully reviewed. In conclusion, Dr. Reynolds made *nineteen* explanatory findings:

1.    Raymond Johnson experienced severe and traumatic emotional neglect during his childhood. His mother's difficulties taking care of Raymond, her insistent verbal abuse, as well as her indifference towards and abandonment of him constituted psychological abuse.

2.    In addition, Raymond experienced severe physical abuse by both his

mother and his father during his childhood that went well beyond the definition of reasonable or acceptable punishment. Between his mother's frequent whippings and his step-father's somewhat less frequent, but physically tortuous whippings, Raymond was the recipient of his parents' violence on a regular, if not daily, basis.

3.      While undoubtedly Raymond's behaviors and legal troubles in adolescence may have had a significant effect on his mother's feelings about Raymond, it is clear that Linda's persistent indifference to many of Raymond's needs were a significant reason and contributor to the very behaviors that she disliked and wanted to control or eradicate in Raymond.

4.      When a child is young, he is not responsible for, nor capable of exerting control or changing such a toxic parental environment.  Such change is beholden on the parent --and parental failure to do so-- whether intentional or not, is experienced by the child as traumatic neglect.

5.      Raymond was exposed to adult sexuality and inappropriate sexual boundaries by a number of family members who Raymond looked to for guidance and modeling. He was encouraged to become sexual at an early age, which resulted in a number of unwanted adolescent sexual experiences and at least one sexual assault in adolescence.

6.      Raymond's delayed disclosure of adult rape and the absence of corroboration by any witnesses for this event is typical of rape, and particularly common in male rape. Raymond continues to blame himself for the rape. Self-blame, combined with Raymond's prior anxieties about his masculinity and rape's stigmatizing association with homosexuality made it likely that he would try to hide this type of victimization.

7.      The combination of parental emotional and physical abuse created a psychologically traumatic environment for Raymond growing up. His parent's divorce and the betrayal Raymond felt when he found out his step-father wasn't his biological father were critical turning points in his early adolescence which resulted in his complete loss of trust in their care.

8.      Raymond's parents abandoned parental oversight of him by age 14. This left Raymond vulnerable to getting his needs for "belonging" and acceptance met in sexual relationships and in the gang.

9.      Caretaker maltreatment of the kind Raymond experienced is an extremely pernicious form of abuse because it impacts the trajectory of every developmental system-from the biologic and trust/attachment systems to the systems that regulate identity emotion and behavior.

10.     When a child is forced to endure physical pain and psychological helplessness of the kind induced by his parents' beatings, and to constantly shape his needs to what a neglectful or indifferent parent is willing to give, a number of neurobiologic and psychological changes occur that become indelible and intense anger is a natural result.

11.     Adult caretakers provided Raymond with a number of damaging models for managing emotions (such as fear and anger) and for solving problems or getting needs met. Every caretaker who was important to Raymond in some way modeled the use of violence, addiction and indifference as coping strategies, all the while telling him "do as I say, not as I do," then dis-owning or abandoning him for following their example.

12.     The abuse Raymond suffered left him with a number of deficits in areas related to:
        a.      Emotional awareness and regulation
        b.      Behavioral self-regulation
        c.      Social functioning

13.     Memories of childhood often function as "psychological shrapnel" in adult victims' psychobiological and behavioral systems.  For many adults who have been through childhood abuse, the emotional complexity and demands of adult relationships can trigger childhood traumatic memories and emotions. When this occurs, the adult may respond to a present-day situation with an intensity that is mis-placed and belongs to the originating traumas.

14.     In the weeks leading up to the extant crime, Raymond experienced a series of relational situations that elicited and triggered traumatic "shrapnel" from his childhood and adolescence.

15.     As his relational distress increased, he coped increasingly through the use of substances, which functioned to compromise his perceptions and dis-inhibit past traumatic feelings and perceptions.

16.     The horror of the rape itself, was compounded not only by the stigma attached to male rape that exists in the culture, but by its power to remind him of his adolescent sexual victimization. Both the past and present sexual traumas caused Raymond to feel unmanageable levels of fear and vulnerability.

17.     Further, his belief that Brooke facilitated this rape re-enacted Raymond's experience of the most painful and catastrophic betrayals and abandonments from his past. This final dis-connection left him both suicidal and homicidal.

18.     To his credit, Raymond's desire to "belong" and to connect to others has repeatedly re-directed him, while in the structured environment of a prison setting, towards his religious beliefs and involvement in ministries. His religious involvement offers him ways to learn to cope with the lifetime effects of such a history and to incrementally change his reactions, beliefs and his feelings in ways that not only benefit him, but which allow him to make good on many of the temperamental proclivities and strengths that were overwhelmed and obfuscated by his troubled history.

19.     The imprint and phenomenology of trauma offered in this report is not meant to excuse Raymond's crime in any way. Rather, it is intended to offer an explanation for the ways in which childhood and adolescent traumatic experiences cause pervasive damage in the emotional, psychobiological and behavioral development of a child which can accumulate and intensify over the course of an individual's lifetime.

I offer these conclusions as well as the context and theory of trauma provided in the body of this report with a reasonable degree of psychological certainty.

Exhibit 11 at 32-34.

Habeas counsel had their own duty to conduct a thorough and independent investigation of all aspects of the case. *See e.g.,* ABA Guideline 10.15.1 at 1079, 1085; 1.11, cmt. (2003). The eminently reasonable investigation found *seventeen* family and friend witnesses whose affidavits are attached and whose sworn testimony greatly

mitigates Mr. Johnson's case and supports Dr. Reynolds' findings.

The witnesses were all easily found.  The affidavits were all easily obtainable. They were from friends (April Viney, attached as Exhibit 12, Cory Gibson, attached as Exhibit 9, Kevin Newton, attached as Exhibit 13, Kevin Moss, attached as Exhibit 14, Latoya Adamson, attached as Exhibit 15, Laura Hendrix, attached as Exhibit 8, Sidricke Lewis, attached as Exhibit 16, Sylvia Goodlow, attached as Exhibit 17, Terrance Cook, attached as Exhibit 18, and Tanishe McCarroll, attached as Exhibit 19) and relatives (Linda Johnson, attached as Exhibit 30, Arthur Johnson, attached as Exhibit 20, Felicia Crosby, attached as Exhibit 21, Jeremy Maxwell, attached as Exhibit 6, Mary Miller, attached as Exhibit 22, Micah Maxwell, attached as Exhibit 23, and quasi-relative Reverend James Reed, attached as Exhibit 24).[29]  Some highlights follow:

> Raymond's mom, Linda, would kick him out of the house all of the time. Her first reaction to anything about Raymond was to scream at him and demand he "leave" or "get out." ... Raymond did not have his own space. ... My mom had a drug problem, but I still had a better place to be than Raymond.  My mom was actually there in the house and there was food for me if I was hungry.  I can't say the same for Raymond.

Exhibit 16 at 1.

> I always felt like Raymond needed something he didn't have. It seemed like he felt a lack of love and a lack of attention.  I could feel his hurt.  I always saw potential in Raymond. ... He needed to be healed from whatever he had

---

[29] Others were found and talked to during the habeas investigation, but for one reason or another an affidavit was not obtained within the time allotted.  Those are Exhibit 29, Affidavit of Anna Wright re Denise Jones, Exhibit 34, Affidavit of Anna Wright re Taquisha Rose, and Exhibit 35, Affidavit of Anna Wright re Jeanette Maxwell.

gone through.  After he had been [in Tulsa] for a while, I started to feel like something was wrong, but I didn't know what.

Exhibit 19 at 1.

[Raymond's mother Linda] was not affectionate.  She never seemed happy.  Linda yelled at Raymond all the time.  She kicked Raymond out of the house.   At one place they lived, Raymond's room was the garage. ...  Arthur was an aggressive man.  I have heard Arthur would beat Raymond. ... I was the same age Raymond was when I found out who I thought was my father was not my real father.  I acted out and became rebellious.  I think a younger child would have dealt with this information better than a 12 to 13 year old.  It was very difficult.  I felt betrayed, lied to my whole life. If my parents would lie to me, then everyone else will too.  I felt like my family could have easily just said "get the fuck out" and it would have been the same.  I felt I had no one to turn to at that point. ...[Raymond] has always craved attention from women.  He wanted a place to  feel wanted and needed.   He never got this from his mother. ...  She just seemed not to care if Raymond was there or gone. ...  Brooke being a stripper would have been really challenging for Raymond because strippers are independent and they do not need you.  Raymond likes to feel needed.

Exhibit 6 at 1-2.

Raymond would run away from home.  My Aunt Linda, Raymond's mom, let him do whatever.  She didn't pay attention to him that much so she didn't care what he did.  She was not like that with his sisters. ... I have seen her cuss Raymond out. ... Sometime after Raymond's mom and step dad got divorced, Raymond, his mom and sisters lived in a house where everyone had their own room except for Raymond.  Raymond was put in the garage.  It had not been converted into a part of the house.  Raymond could go in and out and his mom would not have to see him.  It was just a garage.  Sometimes his mom's car would be parked in there too.  They all moved into another house about a year later, but Raymond still didn't have a room.  He was either on the couch or in the garage again.

Exhibit 23 at 1-2.

I have always had a love for Raymond.  He seemed so sad to me, so gentle.  Even when he was acting like he was having fun, there was still a sadness.

> The sadness in him set him apart from others.  There is a sadness in his eyes. .... I always thought Arthur abused them in some kind of way.  I thought he beat them. ... I know Arthur wanted Linda, but I don't think he wanted Michelle and Raymond. ...  Raymond started trying to run away from home when he was 7 or 8 years old, but he would come back.  I was there once when he crawled out of a window to run away.   He would not always come back immediately when he got older.  Raymond used to come see me a lot when he was an older teenager.  He was respectful.  I enjoyed getting visits from him.  He was affectionate and such a gentle person with his family.  I know Raymond had to go through a lot, a whole lot as a child.  Whatever happened to him, he didn't recover from.

Exhibit 22 at 2.

> After Raymond got out of prison the first time, he stayed at a lot of different places. He could not find a job.  He was frustrated and depressed. ... He told me he was going through a lot of stuff, but he would not go into any detail. ... He told me he wasn't sleeping much ... Raymond wanted to be a provider. He was nurturing and caring. He took care of my kids when I was sick. He told me he loved my kids and he wanted to adopt them. He talked a lot about getting married. ... About a month before the crime Raymond got back in contact with me. He wanted us to get back together.  He seemed genuine in that he wanted to change but he was scattered and all over the place.

Exhibit 17 at 2.

> As a mother, Linda was not very affectionate.  She would pick Raymond up to change his diaper, but would not pick him up to hold him and love on him.   She was hands off ... Linda was very sporadic with her discipline.  She would speak out of anger to the kids and not know where to stop, even with her spankings.  She used a belt.  Sometimes she gave them whoopings ...  Most of our arguments were over Linda's gambling which caused us financial difficulties.   After the divorce, Raymond lived with me. ...  Raymond said he was giving some of his food to his mother and sisters because they needed it. ... It makes me sad and disappointed when I  think about how Linda acted after our divorce.  She started partying and having boyfriends in her house.  People were coming over.  They were using drugs.  It takes money to use drugs and she did not have any. ... Lloyd Bell ... had a whole  other family at the same time he had his family with Ruthie Bell.

Exhibit 20 at 1-3.

> Jennifer told me Raymond had bought Brooke a ring. ... Jennifer called me to tell me Raymond was in a shelter for the homeless. I could not believe it and could not stand the thought of him being there.  Stormy and I immediately went to see him. Raymond was crying and had a horrendous looking gash on his arm. It was infected and was so deep you could see the yellowish tissue underneath his skin. ... Raymond tried to act like his normal self but I could tell he was depressed. ... I didn't know Brooke but I saw how whatever was happening between them was destroying him. I tried to steer him back toward Jennifer. .... Raymond talked a lot about wanting to minister to people who were in prison. He had a notebook full of his ideas and plans to do this. He really took to heart church and being nice. He was really faithful in his thinking. He would take my daughter to church with him and I went with him too.

Exhibit 8 at 1-2.

> A preacher's home, a lot of times, is more disturbing than anyone else's home. ... [Raymond] eluded [sic] many times that it was not as it seemed.  I always suspected Arthur was a womanizer. ... When Raymond was a teenager, he confided in me he felt no one loved him. ... I have never agreed with how [Raymond's mom] handled Raymond after he was released from prison. ... Raymond told me that when he was younger he sold drugs and would give some of the money to his mother and his family. ...I knew Raymond was slowly becoming lost in Tulsa. ...

Exhibit 24 at 1-3.

> I think we crossed into a genuine, trusting friendship when I told Raymond my mother had gambling problems.[30] Raymond was able to relate to me because his own mother has gambling problems too. Raymond told me about the effects his mom's gambling had on the family.  He told me he would give her money in attempts to get her attention and approval.  After this, I don't think we had one conversation that didn't include Raymond talking about issues with his mother. ... Raymond talked about not feeling

---

[30] See Dr. Reynold's report regarding Linda Johnson's severe gambling problem, Exhibit 11 at 8-9; and Exhibit 25, showing her five different bankruptcy filing docket sheets.

supported or accepted by his mother. ...She put more energy into appearances and making sure her rules were followed than she did in helping Raymond through the struggles he was having. ... As Raymond talked to me more about Brooke, I felt like she had a lot going on that Raymond should not involve himself in. I told him that the custody issues with her kids and the issues with her parents were there before he even knew Brooke and he needed to let her handle those things before they should be together. Raymond said he was going to help her "fix" these things, but I knew it was not a good idea. I think part of the reason Raymond stayed with Brooke was because of her children. Raymond wanted to be 100% committed so they would know they had someone to depend on. Both Raymond and I grew up without our dads in the picture. I think when men, especially African American men, grow up without their dads, they make a promise to themselves that they will never do the same thing to another child. Even though Raymond had a history of working, Brooke encouraged him to not work because she made enough money by herself. Raymond became dependant on Brooke as a result. I stopped hearing from Raymond as much when he was with Brooke. Raymond's alcohol use increased and he was taking drugs in an attempt to fit in with Brooke's lifestyle. At one point we lost contact for about a month and that was unusual for me not to hear from Raymond. Not long before the crime, I received a call from Raymond at about two or three in the morning. Raymond said he was bleeding from his anus and thought he needed to go to the emergency room. I asked Raymond what had happened. Raymond said he had woken up after being passed out to find himself bleeding. Raymond said he thought Brooke's dad had possibly raped him. I heard from Raymond a few more times after this. He seemed to be trying to figure out why Brooke's dad would have raped him. He asked me if and how I thought he should approach the subject with Brooke.

Exhibit 9 at 1-4.

### G.    Additional insights.

The second stage defense at trial in its entirety was that Raymond Johnson's "life, based upon his conduct when he was previously in prison, is capable of redemption and a life of value." Tr. X at 1976. The presentation of this one small category of mitigating

evidence left something to be desired.

What the jury could not help but want and need from the second-stage defense in this case was some explanation of why this crime occurred, how Raymond Johnson came to be the kind of person who committed the crime, and how Raymond Johnson could reach a place in his life to be able to commit the crime.

Raymond Johnson's childhood, and the repercussions flowing from that childhood, should have permeated his entire second stage presentation, but instead was completely omitted.  The one-dimensional defense presented was obviously deficient because:

> A detailed presentation of the defendant's childhood experience and a cogent explanation of its long-term repercussions will enable the jury to understand why the defendant committed the crime, perhaps allowing the jury to sympathize or empathize with the defendant. ...
>
> ...
>
> ... factors in the defendant's background and character showing childhood abuse and its long-term negative repercussions on judgment and behavior may make the defendant's commission of the murder more understandable to the jury ....
>
> ...
>
> A mitigation theory based on a defendant's positive qualities has a certain appeal ... [but] is likely to be unrealistic and, therefore, ultimately unpersuasive to the jury.
>
> A more promising form of mitigating evidence is that which provides an explanation for the defendant's commission of the crime. [FN45]

> > [FN45]. *See Hill v. Lockhart*, 28 F.3d 832, 846 (8th Cir. 1994) (quoting a lawyer who testified as an expert at the post-conviction evidentiary hearing that jurors were more likely to impose a life sentence if the defense attorney could explain why the crime occurred); Geimer, *supra* note 33, at 285-87 (positing that the key to a life verdict is explanatory evidence); Haney, *supra* note 32, at 560 (emphasizing the

importance of using mitigating evidence to explain, not excuse, the defendant's conduct); Weisberg, *supra* note 16, at 361 (noting that mitigating evidence explaining the crime is what defendants should most often want to use); White, *supra* note 16, at 361 (explaining that providing a reason for the crime is the most important purpose of mitigating evidence).

By presenting explanatory mitigating circumstances, the defense seeks to show why the defendant committed the crime and, in so doing, to transform the jury's understanding of the defendant and the murder. ... the defendant's goal is to demonstrate how he came to be the kind of person who committed the murder, that his judgment and behavior are not entirely of his own making, and/or that circumstances outside of his control contributed to and affected his conduct.

Crocker, *Childhood Abuse and Adult Murder: Implications For the Death Penalty*, 77 N.C.L. Rev. 1143, 1143-48, 1154-55 (1999). *See also Lingar v. Bowersox*, 176 F.3d 453, 466 (8th Cir. 1999) (Heaney, J., dissenting) (noting the "common-sense observation" from *Hill v. Lockhart* that juries are more willing to impose a life sentence in cases where an explanation for the crime's occurrence is given than in situations where no explanation is given and the jury is left to think "the defendant was just mean").

The following are a few areas of Raymond Johnson's life and record that should have been investigated and presented to help the jury better understand Raymond Johnson and the murders:

- *Hereditary factors*. Raymond Johnson, through no fault of his own, may have inherited genetic traits or predispositions from his father[31] and maternal grandfather,

---

[31] *See* Exhibit 26 for a photographic comparison of Raymond Johnson and his biological father Artura Hamilton.

87

making his commission of the crime more understandable. *See* Subsection C, *supra*.

- *Childhood abuse/neglect/indifference and repercussions*. Many markers for abuse and neglect existed, but were not followed up on. *See* Exhibit 36. Nothing was presented at trial to evoke a single ounce of sympathy or empathy for Raymond Johnson. The following are some pieces of just one category of evidence that should have and would have evoked sympathy: "Raymond experienced severe and traumatic emotional neglect during his childhood. ... Raymond experienced severe physical abuse ... He [experienced] at least one sexual assault in adolescence. ... Adult caretakers provided Raymond with a number of damaging models for managing emotions (such as fear and anger) and for solving problems or getting needs met. Every caretaker who was important to Raymond in some way modeled the use of violence, addiction and indifference as coping strategies, all the while telling him "do as I say, not as I do," then dis-owning or abandoning him for following their example." Exhibit 11 at 32-33. By not introducing, or even investigating these traumatic components of Mr. Johnson's life, the jury was never able to give effect to the "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976).

- *The opposite of a good moral education*. Speaking of "do as I say, not as I do," Raymond Johnson's moral education was highly unusual, and distinctively mitigating:

> Raymond's parents' system of letting him "choose" to get a beating ... had a number of devastating effects on Raymond and negatively impacted his development in important areas such as learning cause and effect and learning from natural consequences. ... this system made it appear as if he

chose this violence towards himself, which increases the traumatic nature of physical abuse and makes it more psychologically damaging.  Moreover, it reinforced Raymond's learning of survival strategies such as defensive anger, impulsivity, numbing and escape. ... this system taught him to de-value physical pain. He told himself "just endure it, just endure it. It will only hurt for a little while." ... He also concluded that, no matter how good or bad he had been, he would receive a whipping from his father's extension cord at least every other week. The arbitrariness of physical abuse and its disconnection from the natural consequences of any given behavior teach children the value of escape and short-term loss of control over long-term thinking, delaying gratification, or accepting uncertainty as part of learning.

When a child is overwhelmingly concerned with physical abuse as a consequence for his behavior, he is often so preoccupied with anticipating, managing or trying to escape the parent's reactions that there is little cognitive reserve left for evaluating the real impact of his behavior beyond the effect it has on his parent's mood. When Raymond was young, he described himself as anxious to please his parents and worried about punishment.

Raymond realized, however, that his preoccupation with being good did nothing to modify his parents' physical abuse, nor his mother's indifference towards him. By the time he was 10 years old, he had learned to numb himself to physical pain and to ignore low-level signals that his behavior was problematic. This allowed him to develop strategies for escape and control that protected him from the emotional hurts of his parents' abuse, but taught him to turn off awareness of cause and effect and right and wrong.

Raymond's sense of cause and effect/right and wrong was also perniciously distorted by the very fact it was developed by parental authorities who were additionally deemed to be heightened moral authorities in the church community due to their status as preacher and preacher's wife. Yet, their presentation of morality varied greatly depending upon whether they were inside or outside of the church environment. His step-father's numerous affairs, his mother's severe gambling addiction, their violence towards him and the emotional indifference his mother showed him were all the more pernicious in subverting his moral development by virtue of his parents' status as role-models in the church community. Thus, a disconnection between what is said to be right and wrong became normative for Raymond.

Exhibit 11 at 27-28.

This is all hugely significant, for at least two reasons.  First, the jury should have known about this as a matter of determining the basic fairness of the death penalty as an appropriate sentence for Raymond Johnson:

> ... In determining the fairness of imposing a particular burden on an individual, it is morally relevant whether he was deprived of an important safeguard against incurring that burden. It follows that in determining the fairness of imposing our harshest burden under the criminal law, we should consider the extent to which he was deprived of a moral education because that serves as an important safeguard against incurring criminal punishment.

Litton, *The "Abuse Excuse" in Capital Sentencing Trials: Is it Relevant to Responsibility, Punishment, or Neither?*, 42 Am. Crim. L. Rev. 1027, 1033 (2005).

The deprivation of a proper moral education is also "especially significant because other offenders, raised in circumstances conducive to the internalization of moral principles, were provided that protection."  *Id.*  *See also* Grey, *Neuroscience, PTSD, and Sentencing Mitigation*, Cardozo 34 Law Rev. 53, 82-83 (2012) ("it is difficult to justify the death penalty for those whose childhood abuse interfered with obtaining [a minimally decent moral education]" as compared to those who were provided that safeguard).

The absolutely crucial nature of this easily ascertainable information becomes clear when it is realized that **the jury received the exact opposite impression on the state of Raymond Johnson's moral education.**  Indeed, the prosecutors made sure the jury heard this false impression over and over and over again:

> you said your father was a bishop and there was a lot of church involvement; correct?
> A. Yes, ma'am.

...
Q. so during that period of time, ma'am, would you agree that Raymond certainly had an understanding of right and wrong?
A. Yes, ma'am.

Tr. X at 1998-99.

Q.  he also, again, knew the difference between right and wrong?
A. Yes, ma'am.
Q. And did it appear to you that he knew that difference prior to 1995 when he was -- or 1996 when he was convicted--
A. Yes, ma'am.
Q. -- of the first killing?
A. It did appear to me, yes, ma'am.
Q. Did it also appear to you that he had a clear understanding of that before 2007 when the killings involved in this case occurred?
A. Yes ma'am.

Tr. X at 2000-01.

Q. And does it always seem to you that Raymond had an understanding of the difference between right and wrong?
A. Yes.

Tr. X at 2014.

Did it appear to you that he knew the difference between right and wrong?
A. Yes.

Tr. X at 2028.

But when you're considering what those [mitigation witnesses] told you, and they tell you, think about this: He had a good childhood. He was surrounded by a support structure that cared. He demonstrated a knowledge of what was right and wrong and has continued to make the wrong decision. He is not a person that has come from a broken home, that doesn't have anyone that loves him, that was never taught right from wrong. In fact, he knows right from wrong.

Tr. X at 2097.

You have Raymond Johnson, who had support from his family, like a lot of people don't. And what you heard today is that he is taught right from wrong as a child, like a lot of people don't. What you heard today is that he most likely had daily lessons from the Bible,[32] which most people don't. His parents, his family, his friends wanted to give him a moral compass and a lot of people don't.

Tr. X at 2106.

This onslaught could not have been unexpected, as the defense had to know that the prosecution would try to persuade the jury his church background made Raymond Johnson especially deserving of the death penalty over someone that was "never taught right from wrong." Tr. X 2097. The defense also had to know this due to all of the ministers who testified on Raymond's behalf. The defense had to know that showing Raymond Johnson could do right not wrong would prompt the prosecution to argue he knew right from wrong.

The defense had numerous clues that were never followed up on indicating things were not as they first might appear when it came to Raymond's childhood, family, and moral education. This could be seen from the reticence of his family, to graphic descriptions of Raymond being an abused outcast in a home with no structure. *See, e.g.,* PC Att. 5; Harold Jones interview, attached as Exhibit 27; Michael Johns affidavit, attached as Exhibit 36. The errors of omission regarding Raymond Johnson's dysfunctional childhood, family life, and moral education were greatly amplified as well

---

[32] The suggestion Mr. Johnson had daily bible lessons appears to have been made up out of whole cloth.

by the prosecution's glaring and repeated misstatement of the law misinforming the jury that the sentencing decision was **limited** to the question of his moral culpability. *See* Ground One, *supra*. The issue of moral culpability was missing from Raymond Johnson's defense to his great detriment.

- *The importance of a structured environment/lack of continuing threat.* As noted previously, defense counsel never argued Raymond Johnson has a proven track record of devoting himself to the ministry and helping others while in prison and therefore the proposed aggravator he is a continuing threat to society is inappropriate. Counsel could have rightly told the jurors in the second stage proceedings that where Raymond was inevitably headed, a structured prison environment, he is not a *threat* to society, but rather a *benefit* to society. This is unfortunate, as the jury found the continuing-threat-to-society aggravator. Dr. Reynolds tied it all together nicely:

> Raymond's desire to "belong" and to connect to others has repeatedly re-directed him, while in the structured environment of a prison setting, towards his religious beliefs and involvement in ministries. His religious involvement offers him ways to learn to cope with the lifetime effects of such a history and to incrementally change his reactions, beliefs and his feelings in ways that not only benefit him, but which allow him to make good on many of the temperamental proclivities and strengths that were overwhelmed and obfuscated by his troubled history.

Exhibit 11 at 34. The importance of structure in this regard was not explored, to Mr. Johnson's great prejudice. *See* Exhibit 36, affidavit of trial investigator Michael Johns, at ¶¶ 3-4. Further, the importance of structure was not explored in order to provide an understanding of how Mr. Johnson went from being a kind, shy child to a man who would

commit such an act.  Had the jury been presented with Mr. Johnson's traumatic childhood, which provided him anything but the structure and stability so vital to a person's development, the jury would have seen that it is only when Mr. Johnson is provided with the structure of prison  – in this case, a sentence of life without parole – that he is able to thrive.  Without structure, he is unable to cope...resulting in the finding of continuing threat.

     *- The growing desperation leading to the crime.*  Much information was kept from the jury about the circumstances leading to the crime.  For all the jury knew, the crime was simply a calculated act of evil.  Much more could have been and should have been presented to provide context and explanation for what happened.  For example, the jury did not know that shortly before the crime a destitute and depressed Raymond Johnson was living in homeless shelters.  *See, e.g.,* Tulsa Day Center for the Homeless records, attached as Exhibit 38.  A more comprehensive story of Raymond Johnson's desperation is easily told through the following affidavits of witnesses (witnesses who were available to testify and either present at trial or easy to find):

> Without a proper support system in place after being released from prison, what foundation a person has crumbles.

Exhibit 28, Declaration of Dr. Betty Evans, at 1.

> I knew Raymond was slowly becoming lost in Tulsa. ...

Exhibit 24 at 3.

> After Raymond got out of prison the first time, he stayed at a lot of different

places. He could not find a job.  He was frustrated and depressed. ... He told me he was going through a lot of stuff, but he would not go into any detail. ... He told me he wasn't sleeping much ... About a month before the crime Raymond got back in contact with me. ... he was scattered and all over the place.

Exhibit 17 at 2.

[Raymond] has always craved attention from women.  He wanted a place to feel wanted and needed. ...  Brooke being a stripper would have been really challenging for Raymond because strippers are independent and they do not need you.

Exhibit 6 at 2.

Jennifer told me Raymond had bought Brooke a ring.

Exhibit 8 at 1.

Even though Raymond had a history of working, Brooke encouraged him to not work because she made enough money by herself.  Raymond became dependent on Brooke as a result.  I stopped hearing from Raymond as much when he was with Brooke.  Raymond's alcohol use increased and he was taking drugs in an attempt to fit in with Brooke's lifestyle.

Exhibit 9 at 4.

Not long before the crime, I received a call from Raymond at about two or three in the morning.  Raymond said he was bleeding from his anus and thought he needed to go to the emergency room.  I asked Raymond what had happened.  Raymond said he had woken up after being passed out to find himself bleeding.  Raymond said he thought Brooke's dad had possibly raped him.  I heard from Raymond a few more times after this.  He seemed to be trying to figure out why Brooke's dad would have raped him.  He asked me if and how I thought he should approach the subject with Brooke.

Exhibit 9 at 1-4.

 ... Jennifer called me to tell me Raymond was in a shelter for the homeless. ... Raymond was crying and had a horrendous looking gash on his arm. It

was infected and was so deep you could see the yellowish tissue underneath his skin. ... Raymond tried to act like his normal self but I could tell he was depressed. ... I didn't know Brooke but I saw how whatever was happening between them was destroying him.

Exhibit 8 at 1-2.[33]

Dr. Reynolds discussed these events in her report:

Extreme fear and anger are typical reactions in any rape victim, as are feelings of sexual aversion and sleep difficulties. Raymond described experiencing all of these reactions after the rape. He continues to maintain a hypervigilance around sleep. He said that many of the medications prescribed for his depression in prison have initial or delayed sedating effects. He described being fearful of entering states that physically mimic the sedation and loss of control he experienced at the time of the rape, and so he rarely stays compliant with his medications. He describes sleeping lightly and over-reacting to cues in the night that remind him of the rape.

...

In the weeks leading up to the extant crime, Raymond experienced a series of relational situations that elicited and triggered traumatic "shrapnel" from his childhood and adolescence.

As his relational distress increased, he coped increasingly through the use of substances, which functioned to compromise his perceptions and dis-inhibit past traumatic feelings and perceptions.

The horror of the rape itself, was compounded not only by the stigma attached to male rape that exists in the culture, but by its power to remind him of his adolescent sexual victimization. Both the past and present sexual traumas caused Raymond to feel unmanageable levels of fear and vulnerability.

Further, his belief that Brooke facilitated this rape re-enacted Raymond's experience of the most painful and catastrophic betrayals and abandonments from his past. This final dis-connection left him both suicidal and homicidal.

---

[33] *See also* PC Att. 10 regarding Raymond Johnson's suicidal ideations.

Exhibit 11 at 19, 34.

"No jury can render justice in the absence of an explanation."  Haney, *supra* at 561.  The lack of any context or explanation on the part of the defense had to be bewildering to jurors.  Due to the deficient performance of counsel, the jury was given absolutely no explanation, which greatly prejudiced his chances at a sentence other than death.

- *Attempt at anger management.*  Witness after witness have spoken about how Raymond Johnson would just walk away when he got mad, even to the point of walking five miles to avoid confrontation.  *See, e.g.,* Tr. X 1991-92, 2001; Exhibit 6; Exhibit 29, Affidavit of Anna Wright re Denise Jones at ¶11.  This mechanism could not help him when it came to Brooke Whitaker.  The situation with Brooke Whitaker was unique:

> Raymond was triggered to the emotions, beliefs and expectancies and behaviors learned in his abusive past ...
>
> ... his relationship with Brooke Whitaker ... was emotionally "stormy" and unstable. While many of Raymond's former girlfriends described him as non-violent, sweet and somewhat avoidant, Raymond and his friends recognized that Brooke elicited much more emotional intensity in Raymond.
> ...
> Brooke elicited Raymond's memories of maternal neglect and his expectancies of betrayal and abandonment ... He became increasingly distressed and confused by this need to prevent abandonment ...His difficulty ... was seen in his intense need to stay in both relationships ...
> ...
> Memories of childhood often function as "psychological shrapnel" in adult victims' psychobiological and behavioral systems.  For many adults who have been through childhood abuse, the emotional complexity and demands of adult relationships can trigger childhood traumatic memories and

emotions. When this occurs, the adult may respond to a present-day situation with an intensity that is mis-placed and belongs to the originating traumas.

In the weeks leading up to the extant crime, Raymond experienced a series of relational situations that elicited and triggered traumatic "shrapnel" from his childhood and adolescence.

...

The horror of the rape itself was compounded ... the past and present sexual traumas caused Raymond to feel unmanageable levels of fear and vulnerability.

Further, his belief that Brooke facilitated this rape re-enacted Raymond's experience of the most painful and catastrophic betrayals and abandonments from his past.

Exhibit 11 at 31-34.

The jury knew nothing of this.  What is worse is the jury did not know Raymond Johnson sought help for his catastrophic trauma and growing distress.  He reached out to his mother and sister Michelle less than a week before the crime, admitting to them he was having trouble controlling his anger and emotions, but had no way to get help for it. Exhibit 30, Affidavit of Linda Johnson.  Nothing immediately panned out, and the next thing Linda Johnson knew Raymond had been arrested.

This could have resonated with a juror.  Indeed, "if only" moments and themes are often highlighted in capital defense presentations, and are emphasized by capital commentators:

Another major theme emphasized by Logan, and present in virtually every case, is "if only:" if only certain critical things had happened differently in the life of the defendant, she would not have committed the crime. ... McNally speaks of "tracing the anger:" "With few exceptions, juries vote

for life because they come - not necessarily to accept - but to understand the client's anger." ... [Such] themes can be construed as ways of describing impairments [which is of] critical importance ...

William Geimer, *Law and Reality in the Capital Penalty Trial,* 18 N.Y.U. Rev. L. & Soc. Change 273, 286 n. 55 (1991) (citations omitted).

The anger management backdrop could have served to describe the impairments throughout Raymond Johnson's life.  And there were certainly more "what if" moments in Raymond Johnson's life; many can be seen in the affidavits of his family and friends. But this "what if" moment, so close to the time of the crime, may have struck a chord with one or more jurors, perhaps ones who have struggled with emotions themselves. Unfortunately, the jury was left in the dark about Raymond Johnson's life, his struggles, his impairments, his growing desperation and distress, and his attempt to get help.

The jury did not receive the "fullest information possible concerning the defendant's life." *Lockett v. Ohio*, 438 U.S. 586, 603.  Counsel performances were deficient, much to Raymond Johnson's great prejudice.  The jury was not shown how Raymond Johnson "came to be the kind of person who committed the murder, that his judgment and behavior [were] not entirely of his own making, and/or that circumstances outside of his control contributed to and affected his conduct."  Crocker, *Childhood Abuse and Adult Murder: Implications For the Death Penalty*, 77 N.C.L. Rev. at 1154-55 (1999).  The jury should have received this information, as it could have made a great difference.

### H.    Procedural Posture.

As can be readily seen, habeas counsel have uncovered numerous "bits" of evidence that can be added on habeas review without further state court proceedings. *Vasquez v. Hillery*, 474 U.S. 254 (1986) (noting substantial additional evidence presented on habeas showing discrimination in selection of grand juries did not run afoul of exhaustion requirement); *see also Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005) (holding new I.Q. evidence did not render claim unexhausted).  This evidence is clearly tied to existing claims previously raised in state court and does not substantially change them. Petitioner does not offer this evidence to assess whether the OCCA's adjudication under §2254(d)(1) is contrary to law or unreasonable.  He firmly believes he has shown that it is.  The evidence does, however, clearly support that a constitutional violation occurred and can be considered by this Court in deciding whether to grant relief.

Should this Court conclude otherwise, this case should be held in abeyance while Mr. Johnson exhausts this material in a second post-conviction application.  *Rhines v. Weber*, 544 U.S. 269 (2005).  Even prior to *Rhines*, the Tenth Circuit recognized the need for and regularly applied stay and abeyance procedures.[34]  District courts within the Tenth

---

[34] *See e.g., Smith v. Sirmons*, Case No. 05-6206, Order on Abeyance (10th Cir. Dec. 5, 2005) (holding appeal in abeyance to allow petitioner to present a newly discovered evidence claim in state court); *Newsted v. Gibson*, 158 F.3d 1085, 1088 (10th Cir. 1998) (describing district court procedure of holding petition in abeyance pending exhaustion of claims in state court); *Hatch v. Oklahoma*, 58 F.3d 1447, 1452 (10th Cir. 1995) (noting Tenth Circuit order to district court to hold petition in abeyance pending exhaustion of claims in state court); *Knapp v. Henderson*, 166 F.3d 347, No. 97-1188, 1998 WL 778774, *3 (10th

Circuit, including this Court, have regularly done the same. Not only does *Rhines* confirm this practice, the case provides "it likely would be *an abuse of discretion* for a district court to deny a stay and dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 278 (emphasis added).  Any failure in this case is the fault of prior counsel. There is certainly no indication Mr. Johnson wanted anything less than full presentation of his case in state court.

Whether the state court will consider matters presented in a second post-conviction application is for the state court to decide on a case-by-case basis, but there are special considerations at play here due to conflict-of-interest issues and other concerns.  *See* Introduction/Conflict of Interest Claim, *supra* at 1-6; Precautionary Statement Concerning Procedural Default*, infra* at 113-121.  *See also Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002); *Slaughter v. State,* 108 P.3d 1052 (Okla. Crim. App. 2005) (providing merits review in ***third*** post-conviction application). Conversely, the significance of any refusal to consider a federal claim would be for this Court to decide.  *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988).

---

Cir. 1988) (ordering district court to hold appellant's habeas petition in abeyance pending exhaustion of state remedies).

## I.   "Appellate" ineffectiveness.

References to ineffective assistance of appellate counsel are made throughout this ground for relief and elsewhere in this Petition, but Mr. Johnson would reiterate that both appellate and post-conviction "appellate" counsel were charged with raising each and every instance of trial counsel's ineffectiveness as well as all errors exiting both in *and outside the record*. ABA Guidelines § 10.8(A)(3)(b)-(c), (B)(1); *Evitts v. Lucey*, 469 U.S. 387 (1985). Indeed, appellate/collateral counsel must conduct an aggressive, thorough and independent investigation of all aspects of the case and cannot rely on what was done before the case came to them. *See, e.g.,* ABA Guideline 10.15.1 at 1079, 1085; 1.11, cmt. (2003).

Mr. Johnson's appellate counsel failure to fully develop and present all instances of prior counsel's ineffectiveness rendered appellate counsel ineffective. *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001) (holding counsel ineffective for not raising claims with reasonable probability of success). *See also* Ground One at 21-22 regarding *Strickland v. Washington, Evitts v. Lucey, and Neill v. Gibson*. It is beyond obvious there was no strategic reason why appellate counsel failed to fully develop and present the unraised allegations and issues asserted herein, especially regarding the ***multiple*** strong grounds for relief regarding second-stage mitigation, ***clearly*** known as essential to a capital case. *Williams*, 529 U.S. 362 (2000); *Wiggins*, 539 U.S. 510 (2003); *Rompilla*,

545 U.S. 374 (2005).[35]

When reviewing the instances of ineffectiveness in this case both individually and collectively, one can see there was more than a reasonable probability success would have been achieved had the evidence and claims been presented.  Counsel's failings in this matter violated Mr. Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### J.    Conclusion.

Individually many of the trial, appellate, and post-conviction "appellate" counsels' failures warrant relief, and certainly that is the case when considered in cumulation as they must be.  The Writ should issue.

### GROUND FIVE

**The lack of adequate instructions to guide the Jury's sentencing decision violated Mr. Johnson's Sixth Amendment right to a fair trial, his Eighth Amendment right to a reliable capital sentencing, and his Fourteenth Amendment right to due process.**

Throughout distant and recent Oklahoma history, jurors have been confused about the meaning and effect of the life without parole sentencing option.  *Littlejohn v. State*, 85 P.3d 287, 293 (Okla. Crim. App. 2004).  Many jurors believe any sentence other than

---

[35] *See also* affidavits of Curtis Allen, Michael Johns, Wayna Tyner, and Rodney Floyd, Exhibits 2, 36, 31, 37.  As discussed elsewhere, it is particularly notable that direct appeal counsel was an inexperienced lawyer writing his first capital appeal brief with no co-counsel to help him.  Moreover, he used only 40 pages of the 100 pages allotted for a capital direct appeal, he did not have his brief proofread, and filed no reply brief, or request for evidentiary hearing.

death will allow for the possible discharge of a defendant onto the streets – a risk they are unwilling to take.

In this case, Mr. Johnson's jury was instructed there were three possible sentences. Namely, life, life without parole, and death. Yet, no guidance on the meaning of these three sentences was given to the jury – despite defense counsel's request for the same. *See*, *e.g.*, O.R. II 244-248, 265-266; V 861-866; VI 968. Had the jurors been properly instructed, they would have been given assurance that regardless of a sentence of death or a sentence of life without parole, Mr. Johnson would be receiving the harshest of sentences without the possibility of ever walking the streets again. The lack of adequate instructions to guide the jury's sentencing decision in this case violated Mr. Johnson's Sixth Amendment right to a fair trial, his Eighth Amendment right to a reliable capital sentencing, and his Fourteenth Amendment right to Due Process.

**A.    A History of Confusion**.

There is no question certain crimes deserve an extremely harsh punishment. Yet, the question becomes which of the harsh punishments available to Oklahoma juries is the most fitting for a particular defendant. Time and time again, juries have resorted to giving a defendant the death penalty not because they think it the most fitting sentence, but because they need the assurance the defendant will not walk the streets again. Put short, jurors simply do not believe life imprisonment without the possibility of parole means just that. *Littlejohn v. State*, 85 P.3d 287, 293 (Okla. Crim. App. 2004) ("[A] fair

number of jurors do not comprehend the plain meaning of the life imprisonment without the possibility of parole sentencing option and question whether the offender is truly parole ineligible").

This is not a problem unique to Oklahoma.  Indeed, the United States Supreme Court has readily acknowledged this problem.  In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the United States Supreme Court reasoned:

> It can hardly be questioned that most juries lack accurate information about the precise meaning of "life imprisonment" as defined by the States.  For much of our country's history, parole was a mainstay of state and federal sentencing regimes, and every term (whether a term of life or a term of years) in practice was understood to be shorter than the stated term.  *See generally* Lowenthal, *Mandatory Sentencing Laws: Undermining the Effectiveness of Determinate Sentencing Reform*, 81 Calif. L. Rev. 61 (1993) (describing the development of mandatory sentencing laws).

*Simmons*, 512 U.S. at 169.

It can hardly be argued such is untrue.  Indeed, there have been too many instances of juror confusion.  *See, e.g., Kelly v. South Carolina*, 534 U.S. 246 (2002); *Simmons v. South Carolina*, 512 U.S. 154 (1994); *Littlejohn v. State*, 85 P.3d 287 (Okla. Crim. App. 2004) ("[C]ommon sense tells us that some jurors may be confused even when, as here, the jury is presented with one traditional life sentencing option, alongside a separate option that specifically states that parole will not be available"); *Malicoat v. State*, 992 P.2d 383, 400 n.43 (Okla. Crim. App. 2000) ("Our error in failing to require instruction as to the meaning of life without parole is of constitutional magnitude and has, in my judgment, resulted in death sentences for many who would otherwise have received the

life without parole sentence") (Chapel, J., dissenting).

Like American history, Oklahoma's past has helped to solidify the confusion on this point.  Up until 1987, life without parole was not a sentencing option under the Oklahoma sentencing scheme.  Okla. Stat. tit. 21, §§ 701.9-701.10.  Instead, a jury was restricted to a life or death sentence for a defendant found guilty of first degree murder.  Even though Oklahoma finally instituted a life without the possibility of parole sentencing option, little has been done to provide jurors with the understanding this new option is different from other life options.  In fact, even when juries have been bold enough to question the sentence's meaning, they have been directed back to the language of the sentence itself.  In reality, this has meant the only "solution" to confusion is to guide jurors back to the very term that created the confusion in the first place.

As such, it is no wonder jurors have continued to believe there are ultimately only two options – death or an eventual chance to walk.  *See Simmons*, 512 U.S. at 170 ("[I]t is impossible to ignore 'the reality, known to the 'reasonable juror,' that, historically, life-term defendants have been eligible for parole.'  *State v. Smith*, 298 S.C. 482, 489-490, 381 S.E.2d 724, 728 (S.C. 1989).").  And, the simple but stark reality is that jurors have given death sentences because their confusion steals their confidence that life without parole means what it says.

There cannot be much blame associated with this.  Jurors who find a defendant to be a genuine danger to society surely would not grant a defendant a lenient sentence if

106

that sentence carries with it the possibility – remote though it may be – of gaining access to society once again.  And, this is a reality not lost on the courts.  "In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant."  *Simmons*, 512 U.S. at 163.  In fact,

> [I]t is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole.

*Simmons*, 512 U.S. at 163-64.  Because of the constitutional principles at play, the courts have established that "when a defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, it violates due process to fail to inform the jury the defendant is ineligible for parole."  *Mayes v. Gibson*, 210 F.3d 1284, 1294 (10th Cir. 2000).

The State in this case alleged Mr. Johnson was a continuing threat, and the jury found the existence of the same.  O.R. VI 1004, 1007.  Nonetheless, Mr. Johnson's jury was not instructed on the reality of the life without parole sentence's terms even though the defense team requested such.  *See*, *e.g.*, O.R. II 244-248, 265-266; V 861-866; VI 968. Specifically, Mr. Johnson's attorneys requested the jury be instructed that

> Under Art. 6, § 10 of the Oklahoma Constitution, the Pardon and Parole Board shall have no authority to make recommendations regarding parole for convicts sentenced to death or sentenced to life imprisonment without parole.  Furthermore, the Governor shall not have the power to grant parole if a convict has been sentenced to death or sentenced to life imprisonment without parole.

In other words, a sentence of life without parole means that the defendant will remain in the penitentiary for all of his natural life with no possibility of parole.   Likewise, a sentence of death means that the defendant will be put to death.

O.R. VI 968.

The Oklahoma Court of Criminal Appeals found no fault with this denial. *Johnson v. State*, 272 P.3d 720, 729 (Okla. Crim. App. 2012).  This was an unreasonable decision and one contrary to controlling law.  The United States Supreme Court has held that "whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been 'arbitrarily and discriminatorily' and 'wantonly and ... freakishly imposed.'" *Simmons*, 512 U.S. at 172-73 (citing *Furman v. Georgia*, 408 U.S. 238, 249 (1972)).

While the Supreme Court has clearly acknowledged the reality and constitutional magnitude of this sentencing problem, the Tenth Circuit has held both that redirection to a court's instruction and a three-sentence choice clarifies any juror confusion.  In *Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000), the Tenth Circuit determined that the cautions advised of in *Simmons v. South Carolina*, 512 U.S. 154 (1994) were inapplicable to the Oklahoma sentencing scheme because the *Mayes* jury was given the choice between life, life without the possibility of parole, and death.  The court reasoned that, unlike the *Mayes* jury, the *Simmons* jury's choice was one only between life and death.  According to the circuit court "this three-way choice fulfills the *Simmons* requirement that a jury be

108

notified if the defendant is parole ineligible." *Mayes*, 210 F.3d at 1294.

The Tenth Circuit's reasoning simply "cannot be reconciled with [the Supreme Court's] well-established precedents interpreting the Due Process Clause." *Simmons*, 512 U.S. at 164.  While it is true the *Mayes* jury was instructed with a "three-way choice," this choice does nothing to dispel the concerns announced in *Simmons*.  *Simmons* centered around the question "whether the Due Process Clause of the Fourteenth Amendment was violated by the refusal of a state trial court to instruct the jury in the penalty phase of a capital trial that under state law the defendant was ineligible for parole." *Id*. at 156.  The Supreme Court held that "due process requires that the sentencing jury be informed that the defendant is ineligible." *Id*. at 156.

Premised on the fact "[t]he Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain,'" the Court found "the jury reasonably may have believed that petitioner could be released on parole if he were not executed." *Simmons*, 512 U.S. at 161 (citing *Gardner v. Florida*, 430 U.S. 349, 362 (1977)).  "[T]he effect [was one] of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." *Id*. at 161.

"While juries ordinarily are presumed to follow the court's instructions, we have recognized that in some circumstances 'the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the

practical and human limitations of the jury system cannot be ignored." *Id*. at 171 (internal citations omitted) (citing *Bruton v. United States*, 391 U.S. 123 (1968)).  Thus, "An instruction directing juries that life imprisonment should be understood in its 'plain and ordinary' meaning does nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines 'life imprisonment.'" *Simmons*, 512 U.S. at 170.  The same holds true of a sentencing option encompassing two or three choices.

Here, it is clear the defense sought an instruction to clarify the very point that resulted in juror confusion. Yet, the trial court did nothing to dispel the confusion.  The OCCA's determination not to settle jurors' confusion is contrary to and an unreasonable application of clearly established law.  The Writ should issue.

## **GROUND SIX**

**The accumulation of errors violated Mr. Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Each of the errors identified herein is sufficient to warrant relief.  Yet, should the Court determine otherwise, the analysis is not done.  Beyond reviewing the errors in their individual capacities, it is necessary for the Court to also consider the aggregate impact of the errors in this case.

The necessary aggregate or cumulative error analysis, which itself is an extension of the harmless-error analysis, "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they

can no longer be determined to be harmless." *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)); *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990).

The justification for this analysis is well established.  Namely, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant *to the same extent* as a single reversible error."  *Rivera*, 900 F.2d at 1469 (emphasis added).  Non-errors do not factor into the analysis.  But, at the same time, a petitioner need not show the individual errors were first prejudicial.  "Indeed, to deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice 'would render the cumulative error inquiry meaningless, since it [would] ... be predicated only upon individual error already requiring reversal.'"  *Cargle*, 317 F.3d at 1207 (quoting *Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002)).

To this same end, petitioners need not carry the burden of establishing prejudice on the aggregate.  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Instead, "[u]nless an aggregate harmlessness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless."  *Rivera*, 900 F.2d at 1470.  *O'Neal*, 513 U.S. at 438 ("[I]f one is left in grave doubt [whether the error itself had substantial influence], the conviction cannot stand.").

Courts have granted relief for such claims.  In fact, in *Cargle v. Mullin*, 317 F.3d

111

1196 (10th Cir. 2003), the Tenth Circuit granted the Writ, in part, for the cumulative error arising from the multiple[36] types of error in the case. Here, there were errors from beginning to end that could have, at minimum, cumulated to deprive Mr. Johnson of his Constitutional guarantees to a fair trial and reliable sentencing proceeding.

As in *Cargle*, the constitutional violations in this case had a "synergistic" effect, particularly in the sentencing phase. 317 F.3d at 1221. In fact, every ground for relief presented in this Petition is synergistic with the other.

Consider this from the perspective of the jurors who decided Raymond Johnson's fate, for example. First, the jury that sat in judgment of Mr. Johnson was unconstitutionally and unfairly comprised in favor of the prosecution. *See* Ground Three. Then, those sitting jurors were strongly led to believe by the prosecution and trial court that they could not *give effect to* the defense's mitigation case. *See* Ground One. Any jurors not nullified by this error (if there were any) were deprived of the compelling, very best "positive prisoner" mitigating evidence trial counsel had through the unconstitutional exclusion and reduction of mitigating evidence. *See* Ground Two. Further, Oklahoma's capital jurisprudence has shown Oklahoma jurors are confused about life without parole, so the refusal of the trial court to adequately instruct the jury about that issue further

---

[36] Both in *Cargle v. Mullin*, 317 F.3d 1196, 1200 (10th Cir. 2003) and in *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003), it was recognized that *all* errors are relevant to the sentence. "[P]rejudice may be cumulated among different kinds of constitutional error." *Cargle*, 317 F.3d at 1200.

diminished Mr. Johnson's lone "positive prisoner" theme. *See* Ground Five. Finally, the multi-faceted unconstitutional evisceration of Raymond Johnson's "positive prisoner" mitigation theme was exacerbated by counsel's inadequate mitigation investigation and development, which led to an unsound decision to solely focus on this one category of mitigation and omit from the jury's consideration the story of Raymond Johnson's life, an explanation for why the crime occurred, how Raymond Johnson came to be the kind of person who committed the crime, and how Raymond Johnson could reach a place in his life to be able to commit the crime. *See* Ground Four.

Despite these errors, however, the OCCA concluded no cumulation of errors. While the OCCA acknowledged the trial was not without error, the court went on to determine "any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render [Mr. Johnson's] trial fundamentally unfair, taint the jury's verdict, or render sentencing unreliable." *Johnson v. State*, 272 P.3d 720, 733 (Okla. Crim. App. 2012). On post-conviction, the court again ruled that "[h]aving determined on direct appeal that there was no accumulation of error sufficient to warrant reversal of his conviction or modification of his sentence, and having found no merit to any of the claims raised here, there is no basis for granting post-conviction relief on this cumulative error claim." Exhibit 1 at 12. These are unreasonable determinations and ones contrary to law.

Both times, the court failed to recognize all of the errors. Further, as shown

throughout the grounds herein, many of the errors impinged on the reliability of the sentencing determination.    In fact, the probability that the continuing course of irregularities influenced the jury and deprived Mr. Johnson a fair trial and a reliable sentencing proceeding is substantial.  Mr. Johnson has shown how his trial was subject to these numerous errors.   And, while each of these individual errors, standing alone, is sufficient to warrant reversal, when the prejudice from the same is viewed cumulatively, there can be no doubt the errors "had [a] substantial and injurious effect or influence in determining the jury's verdict."  *Cargle*, 317 F.3d at 1220 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

Mr. Johnson requests this Court grant the Writ for the cumulative error established herein.

## PRECAUTIONARY STATEMENT CONCERNING PROCEDURAL DEFAULT

Unlike the typical unfortunate capital habeas petitioner, none of Mr. Johnson's claims have been defaulted by the OCCA.   Indeed, as noted previously, the OCCA specifically stated it was deciding the merits of Johnson's post-conviction ineffective-assistance-of-trial-counsel claims, and *not* addressing the procedural bar/conflict of interest issue.  Exhibit 1 at 2-3, 3 n.2.  *See also* Petitioner's "Introduction (and Conflict of Interest Claim)," *supra* at 1-6.

Should a claim be determined to be defaulted, it should still be heard on the merits by this Court.  Mr. Johnson here provides a summary of reasons why all his claims are

entitled to federal review regardless of their procedural posture coming out of state court.

Whether or not a state court procedural default matures into a federal procedural bar is, quite naturally, a federal question. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (holding impact of state procedural default on federal review is a federal question). Of course, the first prerequisite for a federal procedural bar is actual application of a state default. *Harris v. Reed*, 489 U.S. 255, 262, 265 n. 12 (1989) (noting if state does not rely on procedural bar there is no basis for federal court to refuse to consider the merits).

Further, state procedural defaults that are imposed do not bar federal review unless they are both adequate and independent.[37] *Andrews v. Deland,* 943 F.2d 1162, 1188 n.40 (10th Cir. 1991) (maintaining procedural rules must be applied regularly, consistently, and even handedly to establish a bar to federal review; they must also operate independent of federal law); *Brecheen v. Reynolds*, 41 F.3d 1343, 1364 (10th Cir. 1994) (holding provision of meaningful opportunity for review of federal claim also a component of

---

[37] In addition to the adequacy concerns addressed more directly herein, the adequacy of Oklahoma's relatively new mechanisms to litigate extra record claims on direct appeal remains in dispute. *See, e.g.*, *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998); *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999). Mr. Johnson contends Oklahoma's procedures are inadequate. For example, the latest version of Oklahoma Court of Criminal Appeals Rule 3.11 still provides for admission of extra record evidence only concerning claims trial counsel was ineffective and only then if the strong presumption of regularity is rebutted by clear and convincing evidence. Rule 3.11(B)(3)(b)(I). The threshold for review is thus higher than the *Strickland* standard for relief. Therefore, Oklahoma's rules, when enforced, do not provide an adequate opportunity to develop and litigate extra record claims.

adequacy requirement). In making the adequacy assessment, the Court must look to the default actually applied. *Anderson v. Sirmons,* 476 F.3d 1131, 1137, 1140 (10th Cir. 2007) (requiring adequacy of state rule "actually applied by the OCCA" be established). While the Tenth Circuit has found Oklahoma procedural rules adequate, Mr. Johnson wishes to preserve this argument and, moreover, any default that may be entered in this particular case may not be adequate under these rules. *Cf. Banks v. Workman,* 692 F.3d 1133, 1145 (10th Cir. 2012).

The OCCA announced in *Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002) it has broad discretion to grant relief "when an error complained of has resulted in a miscarriage of justice,[38] or constitutes a substantial violation of a constitutional or statutory right." In *Valdez*, the Court of Criminal Appeals not only did not default but granted relief on a **successor** post-conviction claim. *See also Slaughter v. State,* 108 P.3d 1052 (Okla. Crim. App. 2005); *Malicoat v. State*, 137 P.3d 1234 (Okla. Crim. App. 2006).[39]

---

[38] The "miscarriage of justice" referenced in *Valdez* is not narrowly confined to considerations of innocence as that term is used in federal habeas corpus. The Oklahoma rule as a whole, in its construction and as evidenced by its application, casts a much broader net. Indeed, the Oklahoma court's citation to Oklahoma's harmless error rule indicates the rule in *Valdez* is the converse of that rule, allowing review and relief for any error that is not harmless, whenever the error is raised. *Valdez*, 46 P.3d at 711, *citing* Okla. Stat. tit. 20, § 3001.1.

[39] *Valdez* emphasizes also there should be no anticipatory procedural default under the assumption the OCCA would default a claim upon a return to state court for further exhaustion. No one can know in advance what the Oklahoma court will do in a particular case.

*Valdez* has implications for the independence requirement as well. The Court of Criminal Appeals must necessarily consider the underpinnings, including constitutional underpinnings, of any claim before it can apply properly a procedural default.[40] Accordingly, Oklahoma's regime does not operate independent of federal law. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). As the Supreme Court observed in *Ake*, Oklahoma's fundamental error rule on direct appeal meant the OCCA had to consider whether federal constitutional error existed before imposing a procedural default.

> Before applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question.
>
> As we have indicated in the past, when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded.

*Ake*, 470 U.S. at 75.[41]

Under the *Valdez* doctrine, the decision to apply or not apply a state procedural default also requires predicate consideration, explicitly or implicitly, of the merits of

---

[40] If, contrary to the broad language of *Valdez*, Oklahoma is providing this intertwined review for some litigants and not others, this creates another adequacy problem. It is clear *Valdez* review is regularly being provided. *See, also e.g., Wood v. State*, No. PCD-2011-590, slip op. at 4 (Okla. Crim. App. Sept. 30, 2011), attached hereto as Exhibit 32; *Matthews v. State*, No. PCD-2010-1193, slip op. at 6 (Okla. Crim. App. Jan. 7, 2011), attached hereto as Exhibit 33.

[41] *Banks* also rejected an independence challenge but did so without discussing *Ake*. The rejection was based significantly on the fact there was no indication the OCCA conducted a *Valdez* review in that case. 692 F.3d at 1145-47.

petitioner's claims.  The court in  *Valdez* conducted review for federal constitutional error. *Valdez,* 46 P.3d at 710.  The court did the same in *Malicoat* and, further, expressly included federal constitutional claims within the *Valdez* ambit.  *Malicoat v. State,* 137 P.3d 1234 (Okla. Crim. App. 2006).  Accordingly, just as with the fundamental error rule discussed in *Ake*, errors that must be considered under *Valdez* before imposing a default, include all federal constitutional errors.

It is quite clear Oklahoma's procedural default rules are not applied even handedly and are not applied independent of federal law.  Therefore, those procedural rules cannot be the basis for a federal procedural bar.

Further, to any extent appellate counsel's failure to raise or support the claims presented in this Petition results in a federal procedural default, it has clearly been shown that appellate counsel was ineffective.  The claims presented, as discussed under the foregoing individual grounds, have merit.  They present, at least, a reasonable prospect of relief.  *Neill v. Gibson,* 278 F.3d 1044, 1057 n.5 (10th Cir. 2001); *Freeman v. Lane*, 962 F.2d 1252, 1258-59 (7th Cir. 1992).

Moreover, appellate counsel abandoned the responsibility Oklahoma law assigned him to investigate and raise off-the-record claims.  Therefore, the first opportunity for Mr. Johnson to have these claims presented was on post-conviction.  Unfortunately, "appellate" post-conviction counsel failed to investigate and present critical evidence of trial counsel's ineffectiveness. *See, e.g.,* Exhibit 31, Affidavit of Wayna Tyner; Exhibit

37 Affidavit of Rodney Floyd.  This failure constitutes cause to overcome any default.

The Supreme Court decided in *Martinez v. Ryan*, ___ U.S. ___, 132 S.Ct. 1309 (2012) that ineffective assistance of collateral review counsel could constitute cause to overcome a state court procedural default.  The majority opinion in *Martinez* is ostensibly limited to providing cause for failure to raise claims of trial counsel's ineffectiveness. 132 S.Ct. at 1315, 1319.  It also addresses only the scenario where the collateral proceeding was the first opportunity to raise the claim.  *Id*.

In his dissent, Justice Scalia made clear his view that the limiting lines the majority attempted to draw were analytically unsound and this new doctrine of cause would inevitably expand.  *Id*. at 1321-22 (observing "[t]here is a not a dime's worth of difference in principle between those cases and many other cases in which initial state habeas will be the first opportunity for a particular claim to be raised").  It quite naturally already has expanded to include practical, de facto, considerations impeding a meaningful opportunity for review.  *Trevino v. Thaler,* ___ U.S. ___, 133 S.Ct. 1911 (2013).

While direct appeal counsel may have had the unusual responsibility under Oklahoma law  – or at least under the directives of the OCCA – to raise collateral claims of ineffective assistance of trial counsel, Mr. Johnson's appellate lawyer affirms he made no effort to fulfill this responsibility.  PC Att. 4.  Thus, Mr. Johnson's first real and complete opportunity to develop and present a claim his trial counsel failed him was to be on state post-conviction.

Pursuant to *Martinez*, the failure by state post-conviction counsel constitutes cause. The Supreme Court was very careful to distinguish what it was and was not saying in *Martinez*. The Court explicitly chose not to address the pronouncement in *Coleman v. Thompson*, 501 U.S. 722, 752, 755 (1991), that, in general, there is no constitutional right to post-conviction counsel.[42] Rather, the Court announced an exception to *Coleman*'s rule that attorney error, aside from constitutional ineffective assistance, does not constitute *cause* to overcome a state procedural default. *Martinez,* 132 S.Ct. at 1315-16, 1319. Emphasizing this distinction, the Court went on to say that 28 U.S.C. § 2254(I) is not implicated by *Martinez* because the doctrine it announced establishes an equitable mechanism for reaching a claim trial counsel was ineffective, not a ground for relief in and of itself. However, while the Court clearly did not create a new claim or ground for relief, it adopted the standards of *Strickland v. Washington*, 466 U.S. 668 (1984) for assessing whether collateral counsel's performance amounted to cause. *Martinez,* 132 S.Ct. at 1318.

The Court in *Martinez* was expressly concerned with situations where "the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim." *Id*. at 1317. That is the situation here. The Court was also concerned with situations where, as an "equitable matter" collateral counsel's

---

[42] *Coleman* left open the possibility of such a right where collateral review is the first opportunity to raise a challenge. 501 U.S. at 755. The Court in *Martinez* declined to explore this potential opening, however. Mr. Johnson incorporates such a claim herein as well.

120

performance "may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 1318. That is also the situation here.

Omitting quality claims is an indicia of deficient performance. As to prejudice, a reasonable probability of success is all that *Strickland* requires. *Neill,* 278 F.3d at 1057 n.5. *Martinez* requires that Mr. Johnson establish the underlying claim trial counsel was ineffective is "substantial," comparing that showing to one sufficient to obtain a certificate of appealability. *Martinez,* 132 S.Ct. at 1318-19 (*citing Miller-El v. Cockrell,* 537 U.S. 322 (2003))*.* As amply shown in Ground Four, collateral counsel was ineffective because of the force of the underlying claim. Indeed, the claim left inadequately investigated and omitted here is of a type that has won in other cases and should win here.

Accordingly, *Martinez* provides yet another basis for considering Mr. Johnson's meritorious claim on the merits. Relatedly, the doctrine of cause through abandonment of a major aspect of the representation without notice may have some application here as well. *Maples v. Thomas*, ___ U.S. ___, 132 S.Ct. 912 (2012).

Even if some of Mr. Johnson's claims are defaulted for failure to present them earlier, they should not be barred from federal review. Instead, the merits of Mr. Johnson's fundamental constitutional claims should be examined and the Writ should issue.

## REQUEST FOR RELIEF

WHEREFORE, Raymond Eugene Johnson prays the Court grant him all relief to which he may be entitled in this proceeding, to include an evidentiary hearing as to any disputed issues or matters in need of further factual development, and ultimately, a Writ of Habeas Corpus so that he may be relieved of his unconstitutional convictions and sentences.

## MOTION FOR EVIDENTIARY HEARING AND BRIEF IN SUPPORT

An evidentiary hearing is requested pursuant Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts.  As shown herein, an evidentiary hearing is warranted, as there has been no adequate hearing in which the disputed matters asserted have been considered.[43]

A habeas petitioner is entitled to an evidentiary hearing if he has attempted to develop the facts below and if his allegations, if true, would entitle him to relief.  *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998).   Indeed,

> a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not

---

[43] Petition would note the difficulty of evaluating all relevant factually disputed matters prior to the filing of Respondent's response brief.

afford the habeas applicant a full and fair fact hearing.

*Townsend v. Sain*, 372 U.S. 293, 313 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

Here, Mr. Johnson's specific hearing requests are as to matters he previously requested a hearing on in state court, but was denied the same. Specifically, Mr. Johnson requested an evidentiary hearing and discovery in Case No. PCD-2009-1025 before the Oklahoma Court of Criminal Appeals. As noted above, the Oklahoma Court of Criminal Appeals did not afford Mr. Johnson a full and fair fact determination on his requests. *See Barkell v. Crouse*, 468 F.3d 684, 692-94 (10th Cir. 2006) ("Habeas applicants who have not received an evidentiary hearing in state court may be entitled to an evidentiary hearing in federal court.").

The merits of a number of Mr. Johnson's claims are matters of law warranting relief without a hearing. As to other matters, Mr. Johnson believes the facts before the Court warrant issuance of a Writ of Habeas Corpus. Alternatively, he requests an evidentiary hearing on all of the grounds and on all related factual contentions, including the following specific grounds and related factual contentions, as those matters are capable of proof at such hearing and would warrant relief.

In support of this Motion, Mr. Johnson incorporates the relevant allegations of his Petition. In summary, the grounds as asserted in the Petition include:

## GROUND FOUR

**TRIAL AND "APPELLATE" COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT CRITICAL MITIGATING EVIDENCE.**

Mr. Johnson was denied effective assistance of both trial and appellate counsel in violation of the Sixth, Eighth, and Fourteenth Amendments. While Mr. Johnson should be afforded relief on the record presented, at minimum, an evidentiary hearing should be allowed to establish this claim. Such a hearing would be proper as this claim is highly rooted in fact.

In short, both trial and appellate counsel failed to fully investigate, develop, and present the available mitigation evidence necessary for a constitutionally adequate second stage presentation. Instead, counsel presented a minimal defense in a case crying out for mitigation. An evidentiary hearing would assist in establishing counsels' deficient performance in this regard by showing the lack of a reasonable investigation into and presentation of compelling evidence of childhood trauma, among other things. The hearing would also establish the absence of strategy, or at minimum, the use of an unreasonable one with respect to this failing.

It is anticipated the State will object to Petitioner's contention that the withheld or undiscovered information was material or that counsel were unreasonable in failing to present it. However, a hearing would elicit details explaining why this information was a reasonable and necessary product of counsels' duty to investigate and present a complete

124

mitigation story.

An evidentiary hearing would also substantiate Petitioner's claims as to counsels' other failings and the concomitant prejudice as set for in the Petition, including with respect to the following:

## GROUND ONE

**APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE PROSECUTORIAL MISCONDUCT CLAIMS REGARDING MISSTATING THE LAW AND MISLEADING THE JURY IN SECOND STAGE PROCEEDINGS.**

***

## GROUND TWO

**MR. JOHNSON'S RIGHT TO EFFECTIVE TRIAL AND APPELLATE COUNSEL WERE VIOLATED IN REGARD TO THE OUTRIGHT EXCLUSION, AND REDUCTION, OF COMPELLING MITIGATION EVIDENCE.**

Though Mr. Johnson believes the evidence already presented establishes these claims, an evidentiary hearing is certainly appropriate and specifically requested if needed to obtain relief. A hearing would reveal appellate counsel's failings in raising prosecutorial misconduct claims, including where the prosecution grossly misrepresented the law on mitigation – stating mitigation was limited to the issue of moral culpability. A hearing would further solidify the claim that Mr. Johnson's right to effective trial and appellate counsel was violated by the exclusion and/or reduction of compelling mitigation evidence. A hearing would establish the nature and scope of each of these grounds.

125

## CONCLUSION

Finally, Mr. Johnson renews his request for a hearing on any other issue, substantive or procedural, which involves facts not apparent from the existing record and on any issue that involves facts disputed by Respondent. He also requests a hearing on any fact that may be discovered in support of his Petition. Finally, to the extent this Court considers claims may be subject to procedural defenses because they were not presented properly in state court, Mr. Johnson requests any hearing necessary to show the inadequacies of Respondent's procedural defense(s) or that cause and prejudice overcome them.

There are disputes in this case that demand an evidentiary hearing. This Court should grant relief on the Petition as it now stands, or alternatively, grant an evidentiary hearing on the foregoing issues.

## MOTION FOR DISCOVERY AND BRIEF IN SUPPORT

Petitioner, Raymond Johnson, requests leave of Court to conduct discovery pursuant Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts. *See also* Rules 26-37 of the Federal Rules of Civil Procedure.

## DEFINITIONS

The terms "law enforcement," "authorities," or "police" refer collectively, without limitation, to the Tulsa County District Attorney's Office, the Tulsa County Sheriff's Office, the Tulsa Police Department, the Oklahoma State Bureau of Investigation (OSBI),

the Federal Bureau of Investigation (FBI), and any other agency or individual involved in the investigation of this case.

The term "this case" refers to the Brooke and Kya Whitaker homicides, the investigation of those homicides, and the state prosecution of Raymond Johnson in Case No. CF-2007-3514, Tulsa County District Court, and all subsequent appeals and collateral proceedings.

"Documents," "records," and "things" refer, but are not limited to writings, drawings, graphs, charts, photographs, negatives of photographs, photographic slides, motion picture films, audio and video tape recordings, records, information stored electronically or on computer, and physical items in the possession, custody, or control of the above entities or individuals.

## ARGUMENT AND AUTHORITY

Rule 6(a) of the Rules Governing Section 2254 Cases expressly permits this Court to authorize discovery. The only procedural prerequisites are that the reasons for the request be provided and a list of documents or items sought and a statement of interrogatories to be propounded accompany the discovery request. Rule 6(b).

The standard for granting discovery under Rule 6 is "good cause." In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Court held the "good cause" requirement was met when there was an inference the materials sought might help establish a petitioner's detention was illegal. The standard is not onerous, nor should it be.

127

The higher standards of reliability required in capital cases provide further support for discovery in this case. *Woodson v. North Carolina*, 428 U.S. 280 (1976). The Tenth Circuit has echoed those concerns. *Banks v. Reynolds*, 54 F.3d 1508, 1521 (10th Cir. 1995) ("Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.").

## SPECIFIC REQUESTS

All too often Oklahoma prosecutors have been found to have violated their *Brady v. Maryland*, 373 U.S. 83 (1963) and related *Napue v. Illinois*, 360 U.S. 264 (1959) obligations in capital cases; at other times, they have exhibited a fundamental misunderstanding of these obligations. *See, e.g., Woodruff v. Ward*, Case No. CIV-96-1076, slip op. at 24 n.18 (W.D. Okla. July 22, 1999) (Doc. No. 63) (involving fundamental misunderstanding of *Brady* obligation); *Douglas v. Workman*, 560 F.3d 1156, 1170-71, 1177-80 (10th Cir. 2009) (finding *Brady* violations concerning star witness in two related capital cases); *Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir. 2001) (involving failure to produce exculpatory evidence); *Banks v. Reynolds,* 54 F.3d 1508 (10th Cir. 1995). In some cases, exculpatory material has been found in prosecutors' files years after the convictions and death sentences and only as a result of federal proceedings.[44] Even though Mr. Johnson has continued to request discovery throughout

---

[44] In this regard, it is notable the prosecution's duty to disclose exculpatory information is not extinguished after the defendant is convicted, but rather extends to habeas corpus proceedings. *People v. Gonzalez*, 51 Cal.3d 1179, 1260-1261 (1990), relying on

the proceedings, there should be no assumption prosecutors in this case have complied with their *Brady* obligations.[45]

Mr. Johnson is concerned prosecutors may not have disclosed exculpatory evidence in this case. There were several areas where documents seemed to be missing. Indeed, from what was disclosed, it appears the District Attorney's Office strangely did not put together any files on any of the witnesses it presented at trial. In particular, Petitioner believes exculpatory/mitigating evidence may exist in relation to the victim Brooke Whitaker and her family, particularly her brother and biological father. The file provided trial counsel was noticeably devoid of information about them.

These occurrences deserve further exploration and development. Accordingly, Mr. Johnson requests the following discovery be permitted:

REQUEST FOR PRODUCTION NO. 1:

Produce all district attorney records, files, and things pertaining to this case.

---

*Imbler v. Pachtman,* 424 U.S. 409, 427 n. 25 (1976); *Thomas v. Goldsmith*, 979 F.2d 746, 749-750 (9th Cir. 1992); *People v. Garcia,* 17 Cal.App.4th 1169, 1179 (1993). At any stage of the proceedings, the prosecution has a duty first and foremost to "set the record straight." *Banks v. Dretke*, 540 U.S. 668, 676 (2004) (giving death row inmate last minute opportunity to litigate federal habeas corpus petition despite procedural default because of failure to disclose impeachment material about informant).

[45] There is no mechanism for discovery on direct appeal. Pursuant *Bland v. State*, 991 P.2d 1039, 1040 (Okla. Crim. App. 1999), the only realistic possibility of uncovering new evidence on state post-conviction is with an evidentiary hearing, as the traditional mechanisms of discovery are otherwise unavailable.

REQUEST FOR PRODUCTION NO. 2:

Produce all Tulsa County, Tulsa Police, OSBI, and/or FBI law enforcement records, files, and things pertaining to this case.

INTERROGATORY NO. 1:

Describe the substance of all oral contacts and/or conversations between law enforcement and Mr. Raymond Johnson pertaining to this case.

INTERROGATORY NO. 2:

Describe the substance of all oral contacts and/or conversations between law enforcement and members of Brooke Whitaker's family pertaining to this case.

## **CONCLUSION**

Discovery is required where the object of the request is "indispensable to a fair, rounded, development of the material facts." *Coleman v. Zant,* 708 F.2d 541, 547 (11th Cir. 1983) (quoting *Townsend v. Sain*, 372 U.S. 293, 322 (1963)).  In order to ensure the facts in this matter are fully developed, this Court should grant the requested discovery.

Respectfully submitted,

s/ Thomas D. Hird
THOMAS D. HIRD, OBA #13580
SARAH M. JERNIGAN, OBA #21243
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102
Telephone: (405) 609-5975
Facsimile: (405) 609-5976
tom_hird@fd.org
sarah_jernigan@fd.org

BEVERLY A. ATTEBERRY, OBA #14856
P.O. Box 420
Tulsa, OK 74101-0420
(918)605-1913

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2013, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. The sealed documents will be delivered by hand to designated counsel listed below. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

Jennifer L. Crabb, OBA #20546
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone: (405) 521-3921
fhc.docket@oag.state.ok.us
*Attorney for Respondent*

s/ Thomas D. Hird
Assistant Federal Public Defender

131